**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

LATIN AMERICANS FOR SOCIAL AND ) 
ECONOMIC DEVELOPMENT ) 
4138 W. Vernor ) 
Detroit, MI 48209; ) 
) 
CITIZENS WITH CHALLENGES ) 
1875 S. Deacon St. ) 
Detroit, MI 48217; ) 
) 
DETROIT ASSOCIATION OF BLACK ) 
ORGANIZATIONS ) 
12408 Grand River Avenue ) 
Detroit, MI 48204; ) 
)     Case No. _____
DETROITERS FOR PROGRESS ) 
1363 Fisher Freeway, Suite 7 ) 
Detroit, MI 48207; ) 
) 
MANA DE METRO DETROIT ) 
4138 W. Vernor ) 
Detroit, MI 48209; ) 
) 
MEXICAN PATRIOTIC COMMITTEE ) 
OF METRO DETROIT ) 
4128 W. Vernor ) 
Detroit, MI 48209; ) 
) 
DETROIT INTERNATIONAL BRIDGE ) 
COMPANY, ) 
12225 Stephens Road ) 
Warren, MI 48089; ) 
) 
Plaintiffs, ) 
) 
v. ) 
) 
The ADMINISTRATOR of the Federal ) 
Highway Administration, in his official ) 
capacity, ) 
1200 New Jersey Avenue SE ) 
Washington, DC 20590; ) 
) 

1

The FEDERAL HIGHWAY               )
ADMINISTRATION, an agency of the  )
United States Department of Transportation,  )
1200 New Jersey Avenue SE         )
Washington, DC 20590;             )
                                  )
JAMES J. STEELE, in his official capacity  )
as the Michigan Division Administrator of  )
the Federal Highway Administration,  )
315 W. Allegan                    )
Lansing, Michigan 48933;          )
                                  )
Defendants.                       )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Latin Americans for Social and Economic Development, Citizens with Challenges, Detroit Association of Black Organizations, Detroiters for Progress and Detroit International Bridge Company, by their undersigned attorneys, allege:

### PARTIES

***Plaintiff Latin Americans for Social and Economic Development, Inc.***

1.      Plaintiff Latin Americans for Social and Economic Development, Inc. ("LA SED") is the oldest nonprofit organization serving the Latino community in Southwest Detroit. Since 1969, LA SED has assisted people of all ages with a variety of bilingual services, recreational activities for older adults, and youth development programs.

2.      Every member of LA SED's board is or was a resident of the Southwest Detroit community that the organization serves.  Many LA SED staff members are former clients who continue to live in the neighborhood.

3.      The Detroit River International Crossing ("DRIC") project presents a deadly threat to the Southwest Detroit neighborhoods that LA SED has served for forty years.  The

2

DRIC project will destroy more than 100 acres of homes, churches and businesses to make way for an unnecessary new international border crossing.

4.     What is now a cohesive neighborhood will be fractured beyond repair, and what remains of the neighborhood will be completely isolated.

5.     If the DRIC project goes forward, Delray will be situated between the existing Ambassador Bridge to the east, the new DRIC bridge to the west, I-75 to the north and the Detroit River to the south.  These barriers will place the Delray community in a stranglehold, and its life will be choked out.

6.     In April 2008, LA SED submitted a comment letter complaining that the DRIC Draft Environmental Impact Statement ("DEIS") did not adequately catalogue the adverse impacts of the DRIC project.  LA SED's letter asked Defendant Federal Highway Administration ("FHWA"); its Michigan Division Administrator, Defendant James Steele; and the Michigan Department of Transportation ("MDOT") (collectively, the "US DRIC Proponents") to take a closer look at the community impacts of their project.  They refused to do so, and the Final Environmental Impact Statement ("Final EIS") does not contain sufficient discussion of the problems the DRIC bridge would cause in Delray and Southwest Detroit.

### *Plaintiff Citizens with Challenges*

7.     Plaintiff Citizens with Challenges is a nonprofit organization dedicated to creating new leadership through education, social and physical development.  Its Director, Otis Mathis, is a lifelong resident of Southwest Detroit and Delray, and a member of the Detroit School Board.

8.     The DRIC project will have a direct and adverse impact on the residents of Southwest Detroit who receive services from Plaintiff Citizens with Challenges.

9.      A new DRIC bridge and customs plaza will destroy homes, churches and businesses.  The homes and community spaces that remain will face dramatically worsening air quality as a result of 24-hour a day truck and car traffic in the plaza.

10.      The DRIC environmental review has never fully documented these harms to the residents of these vulnerable neighborhoods.

11.      The DRIC DEIS and Final EIS completely abdicate the US DRIC Proponents' environmental justice responsibilities.

12.      Plaintiff Citizens with Challenges participated in public meetings and hearings and challenged the veracity of the information the proponents of the DRIC project were presenting to the community.

13.      The US DRIC proponents ignored those challenges.

### Plaintiff Detroit Association of Black Organizations

14.      Plaintiff Detroit Association of Black Organizations ("DABO") is a federation of over 130 black and non-black organizations whose primary purpose and mission is to empower, equip and to serve those organizations.

15.      Numerous members of Plaintiff DABO's various organizations live and work in Southwest Detroit, including the Delray neighborhood.

16.      The organizations themselves and those individual members would be harmed by the DRIC project.

17.      The business of several DABO member businesses will be destroyed by the DRIC project.

18.      The damage to Delray and Southwest Detroit from the DRIC project would send ripples throughout metro Detroit's minority community.  The guarantees of environmental

justice that are supposed to protect minority and low-income businesses and individuals would be revealed as empty promises if the US DRIC Proponents are permitted to destroy Delray with a new border crossing and customs plaza.

19.    Members of Plaintiff DABO participated in the DRIC environmental review process.  Plaintiff DABO agrees with the comments submitted by its co-plaintiffs.

### Plaintiff Detroiters for Progress

20.    Founded specifically to address the issues surrounding construction of a new border crossing in Southwest Detroit, Plaintiff Detroiters for Progress gives voice to those residents of the Delray and Southwest Detroit communities who have been left out of the DRIC process.

21.    The Director of Detroiters for Progress, Adolph Mongo, is a resident of Detroit whose quality of life will be directly and adversely affected by the construction of the DRIC project.

22.    Through Mr. Mongo, Plaintiff Detroiters for Progress has participated in numerous community meetings and presentations made by the US DRIC Proponents.  The information presented at these events has been self-serving and, in many cases, false and misleading.

23.    The US DRIC Proponents contend that building a new international border crossing and customs plaza in the middle of a sensitive, minority and low-income neighborhood will somehow improve the neighborhood.  People who have little hope of improving their circumstances in other ways are all too ready to believe these kinds of empty promises.

24.    Plaintiff Detroiters for Progress exists to expose the truth:  The DRIC project will destroy the Delray neighborhood and severely damage all of Southwest Detroit.

25.    The DRIC project is not necessary to serve the current or foreseeable future traffic between Detroit and Windsor.

26.    Plaintiff Detroiters for Progress participated in numerous public meetings regarding the DRIC project, and agrees with the views expressed in the comments submitted by its co-plaintiffs in the present case.

27.    Latin Americans for Social and Economic Development, Citizens with Challenges, Detroit Association of Black Organizations and Detroiters for Progress are sometimes hereinafter collectively referred to as the "Association Plaintiffs."

### *Plaintiff MANA de Metro Detroit*

28.    Plaintiff MANA de Metro Detroit is the local chapter of MANA, a National Latina Organization.  MANA's mission is to empower Latinas through leadership development, community services and advocacy.

29.    Numerous members of MANA de Metro Detroit live and work in Southwest Detroit, including in the Delray neighborhood.  The lives of these individuals will be dramatically impacted for the worse if the DRIC project goes forward.

30.    The DRIC Proponents have paid little or no attention to environmental justice by choosing Delray and Southwest Detroit as the site of the new DRIC bridge.

31.    MANA de Metro Detroit submitted a comment letter detailing these and many other concerns with the DRIC project in April 2008.  The DRIC Proponents have ignored that letter, as they have ignored their environmental justice responsibilities throughout the DRIC process.

*Plaintiff Mexican Patriotic Committee of Metro Detroit*

32.    Plaintiff Mexican Patriotic Committee of Metro Detroit ("MPC") is an all volunteer organization that has been part of Southwest Detroit's growth since the 1920s. Today, MPC continues to contribute to economic growth and build neighborhoods.

33.    Virtually all of MPC's members reside in Southwest Detroit, and many live in the Delray neighborhood that will be devastated by the DRIC project.

34.    MPC members attended numerous meetings held by the US DRIC Proponents in an attempt to understand better how the DRIC project would affect their lives. They were met with a confusing array of maps, books and videos that were designed to make the project sound like it would somehow benefit Delray residents.

35.    In fact, the DRIC project will irreparably damage Southwest Detroit by destroying numerous homes and businesses and isolating the rest of the community.

36.    MPC filed a comment letter in April 2008 that asked the US DRIC Proponents to slow down and reconsider the value of the DRIC project, but that letter was ignored.

*Plaintiff Detroit International Bridge Company*

37.    Plaintiff DIBC is a Michigan corporation with its principal place of business in Warren, Michigan. DIBC is the owner and operator of the Ambassador Bridge, an international toll bridge connecting the cities of Detroit, Michigan and Windsor, Ontario, which carries approximately one quarter of all commercial traffic between the United States and Canada.

38.    DIBC is the owner of a substantial amount of property in Delray and in Southwest Detroit.

39.     The DRIC DEIS and Final EIS make clear that the DRIC project is intended to poach as much as 75% of the commercial traffic currently using the Ambassador Bridge.  Such a steep drop in traffic would severely harm DIBC.

40.     DIBC submitted two sets of comments on the DEIS, as well as comments on the Final EIS and the DRIC Record of Decision ("ROD").  The US DRIC Proponents' responses to those comments were wholly inadequate, and resulted in no substantive changes to the DRIC environmental review.

### Defendants

41.     Defendant Administrator is the politically-appointed Administrator of FHWA. Defendant Administrator's principal place of business is 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

42.     Defendant FHWA is an agency of the United States Department of Transportation.  FHWA has Division offices in every state, and it is headquartered in Washington, D.C.

43.     Defendant James J. Steele is the Michigan Division Administrator of FHWA, and is an employee of the United States.  His principal place of business is 315 W. Allegan, Lansing, Michigan 48933.

## JURISDICTION AND VENUE

44.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321, *et seq.*, Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303 & 23 U.S.C. § 138, Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*, and the Declaratory Judgment

Act, 28 U.S.C. §§ 2201, *et seq.* A live, justiciable controversy now exists between the parties, and the relief requested is accordingly proper under these statutes.

45.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendant FHWA is an agency of the United States with its primary offices in the District of Columbia, and Defendant Administrator also maintains his primary office in the District of Columbia.

46.     The United States has waived its sovereign immunity from Plaintiffs' claims pursuant to 5 U.S.C. § 701 and 16 U.S.C. § 1540.

47.     Plaintiffs have standing to bring this action either in their own right or via the doctrine of associational standing because they either are or represent members of the local community that will be adversely affected by the Defendants' action.

## FACTUAL BACKGROUND

**A.     History of the Southwest Detroit Community and the Ambassador Bridge**

48.     Southwest Detroit has long been one of the most ethnically and racially diverse areas of the city. The Delray neighborhood of Southwest Detroit was settled in the mid-19th century and has been home to thriving immigrant populations, including Hungarian and Polish communities, as well as significant African-American and Hispanic populations.

49.     In the larger Southwest Detroit area, a 2006 survey showed that 44% of the 109,000 residents were Hispanic, 37% were black, and only 17% were white. Final EIS at 3-36. Thirty-nine percent of Southwest Detroit residents—more than 42,000 people—have incomes below the poverty level. *Id.*

50.     For purposes of the DRIC environmental review, the Delray study area included 40,435 people. Of those, 69% were recognized as minorities in the 2000 census. Over 9% of Delray residents identified themselves as black or African-American, and more than 58%

described themselves as Hispanic/Latino.  Final EIS at 3-27.  Nearly one-third of Delray

residents have incomes below the poverty level.  *Id.*.

51.    The privately-owned Ambassador Bridge spanning the Detroit River between

Detroit, Michigan and Windsor, Ontario is the busiest crossing in North America and carries

more than a quarter of all commercial traffic between the United States and Canada.

52.    The Ambassador Bridge is an international toll bridge that operates four lanes of

truck and automobile traffic between Detroit, Michigan and Windsor, Ontario, with customs

plazas, approach roads, and other related facilities in Detroit and in Windsor.  The Ambassador

Bridge is the busiest international trade corridor between the United States and Canada,

accounting for approximately one quarter of all land trade between the two countries.

53.    In addition to the Ambassador Bridge, there are already six (6) international

crossings connecting southeast Michigan with southwest Ontario that carry truck trailers of

freight—the twin Blue Water Bridges in Port Huron, the Detroit and Windsor Tunnel, the

Canadian Pacific railway tunnel in Detroit, the Canadian National railway tunnel in Port Huron,

and a ferry service in Detroit.

54.    The right to build and operate the Ambassador Bridge was created by reciprocal

legislation of the U.S. Congress and the Parliament of Canada in 1921.  The Congressional Act

granted DIBC the right to "construct, maintain, and operate a bridge and approaches thereto

across Detroit River at a point suitable to the interests of navigation, within or near the city limits

of Detroit, Wayne County, Michigan."  Act of Mar. 4, 1921, Sess. III, Ch. 167 (1921).

Construction of the Current Span was completed in 1929.

55.    The developers of the Ambassador Bridge sought government investment when

the bridge was conceived, but none of the four governments would advance money for such an

engineering challenge—not the U.S. government, the Michigan government, the Canadian government, or the Ontario government.

56.     Therefore DIBC undertook with private funds the engineering and financial challenge of designing and building what was then the longest suspension bridge in the world, and the bridge upon which the design, engineering, and construction techniques later used for the San Francisco Golden Gate Bridge were developed and tested.  The Ambassador Bridge has been privately financed, owned, and operated throughout its history.

**B.     The Ambassador Bridge/Gateway Project and the Second Span of the Ambassador Bridge**

57.     The Ambassador Bridge is 80 years old.  Plaintiff Detroit International Bridge Company, Inc. ("DIBC"), the owner and operator of the Ambassador Bridge, has proposed building a 6-lane bridge span ("Second Span") from the existing Detroit bridge plaza to the existing Windsor bridge plaza on land already used by DIBC for Ambassador Bridge operations and ancillary services.

58.     The Second Span would service all international traffic demands between Southeast Michigan and Southwest Ontario including all traffic to and from U.S. highways I-75, I-96, and I-94 to and from Canadian highway 401 for the foreseeable future and would not displace any homes, churches or business on either side of the border.

59.     Incredibly, the US DRIC Proponents propose to squander the hundreds of millions of dollars that taxpayers are currently investing in the nearly-completed Ambassador Bridge/Gateway Project even before that project can be opened.  The Ambassador Bridge/Gateway Project was passed by Congress to speed up international traffic over the Ambassador Bridge. Congress expressly stated that the Ambassador Bridge/Gateway Project was intended to accommodate construction of the privately-financed Second Span of the Ambassador

Bridge.  The US DRIC Proponents intend to defeat the Congressional directive to improve the Ambassador Bridge by diverting traffic **away** from the Ambassador Bridge immediately after hundreds of millions of taxpayer dollars have been invested in connecting the Ambassador Bridge to the U.S. highway system.

 60. The requisite National Environmental Policy Act ("NEPA") review by the US DRIC Proponents arbitrarily excluded the Second Span as a DRIC location, despite the express language of Congress included in the Ambassador Bridge/Gateway Project appropriation that the Gateway Project is to be built to accommodate the Second Span.  DRIC disregarded this Congressional preference by disqualifying the Second Span from consideration as an alternative for active review as a DRIC location even though the Second Span scored as a preferred site in the United States.

 61. Building the Second Span at the site of the existing Ambassador Bridge would cause the least impact on the environment because the current span of the Ambassador Bridge is already there and has already had its impacts on the environment since it was completed in 1929. The Ambassador Bridge companies own all land necessary for the Second Span both in Detroit and in Windsor.  The U.S. highway connections to the Ambassador Bridge are being completed right now and their environmental impact has already been vetted. Dismissing the Second Span location from the DRIC study was the act of an obviously biased decision maker.

 62. The DRIC project is a massive waste of taxpayer money intended to destroy the value of the Ambassador Bridge/Gateway Project before it even opens, forcing destruction of a minority neighborhood along with the displacement of more than 400 homes, 43 businesses, and numerous non-profit organizations and churches.

**C.      Canadian Opposition to the Second Span of the Ambassador Bridge**

63.      For years, the US DRIC Proponents have schemed with Canadian officials to build an entirely new publicly-owned international bridge between Detroit and Windsor within the Ambassador Bridge's existing international traffic corridor and to divert traffic from the Ambassador Bridge's existing industrial zoned location to the minority, low-income mixed residential/commercial/industrial Delray neighborhood of Southwest Detroit.

64.      The Final EIS projects that the DRIC bridge will divert as much as 75% of the traffic from the Ambassador Bridge to the DRIC bridge.

65.      Upon information and belief, the US DRIC Proponents are improperly prejudiced against private ownership of the Ambassador Bridge, and have shown repeatedly that they will pervert the NEPA review process to approve a publicly owned bridge to poach the traffic revenues from the Ambassador Bridge even though the residents and business owners of the Delray neighborhood of Southwest Detroit will be the innocent victims of this illegal and unfounded bureaucratic prejudice.

66.      The position taken by Transport Canada, the federal ministry for transportation in Canada; and by the Ontario Ministry of Transportation, the provincial ministry for transportation in Ontario, Canada; and by the City of Windsor (collectively, "Canadian DRIC Proponents") was that neither the DRIC  bridge nor the Second Span to the Ambassador Bridge should be built in the predominately middle class, white population of Windsor, Ontario where the Ambassador Bridge's current span has been located and operating for 80 years.

67.      The Canadian DRIC Proponents unilaterally determined that any new bridge span would have to land in the Brighton Beach, Ontario area rather than Windsor, where the Ambassador Bridge is already located and operating, to avoid impacts on Windsor.  Upon

information and belief, the US DRIC Proponents accepted the decision of the Canadian DRIC Proponents without question.

68.    The Governor of Michigan, Jennifer Granholm, announced that the State of Michigan through MDOT would not allow the DRIC bridge to be located in any of the so-called Downriver areas of metropolitan Detroit which have a predominately middle class, white population.

69.    The only locations that were acceptable to the Governor's office and MDOT were locations in the low income, minority populated Delray residential area of Southwest Detroit.

70.    Acceptance of this position by the US DRIC Proponents was a violation of the environmental justice guarantees of NEPA and has caused and continues to cause damage to Plaintiffs.

71.    The combination of the Governor's action, the support of MDOT for the Governor's unilateral and political decision, and the decision of the Canadian DRIC Proponents to only allow a new bridge at Brighton Beach, Ontario meant that the proposed DRIC bridge could only be located in the Delray neighborhood of Southwest Detroit.

72.    All other potential locations were eliminated from consideration due to these political decisions without regard to the requirements of NEPA concerning protection of the environment or environmental justice.

73.    The US DRIC Proponents abrogated their duties under NEPA by granting to the Canadian DRIC Proponents the power to determine where the DRIC bridge should be built in Detroit and what was best for the citizens of the United States under NEPA.

74.     Once the Brighton Beach location was unilaterally decreed by the Canadian DRIC Proponents, engineering would only allow construction that would land in the Delray neighborhood.

75.     Upon information and belief, the Canadian DRIC Proponents are intentionally stalling the processing of the Canadian environmental assessment of the Ambassador Bridge Second Span in order to start construction of the DRIC bridge first in an attempt to financially destroy the Ambassador Bridge.

76.     NEPA considers cross border impacts of U.S. projects; this Court should likewise take into consideration the cross border failure of the Canadian DRIC Proponents to provide environmental due process to Plaintiffs.

77.     As a result of the pressure from the Canadian DRIC Proponents, the US DRIC Proponents are proceeding to design and construct the DRIC bridge at a location that creates massive adverse impacts in the United States in order to avoid any impacts whatsoever in Canada.

78.     Both the express language and the spirit of NEPA cannot tolerate such an abrogation of responsibilities by the US DRIC Proponents that would sacrifice a predominately low income, minority racial community in Detroit to avoid impacting a predominately middle income, majority racial community in Windsor, Ontario.

**D.     The 2004 Planning/Need Feasibility Study**

79.     In early 2001, FHWA entered into a partnership with MDOT, Transport Canada and the Ontario Ministry of Transportation ostensibly intended to study ways to improve "the safe and efficient movement of people, goods and services across the U.S./Canada border at the Detroit and St. Clair Rivers . . . ."

80.     Despite its eloquently stated purpose, the so-called "Border Transportation Partnership" set its goal to be the construction of a new, publicly-owned crossing between Detroit and Windsor close enough to the Ambassador Bridge to allow it to divert traffic from the Ambassador Bridge in order to finance the anticipated financing debt of the DRIC bridge at the expense of the Ambassador Bridge.

81.     That goal necessitated having a location sufficiently close to the Ambassador Bridge so that Ambassador Bridge traffic could be poached by the DRIC bridge.

82.     The Association Plaintiffs and their represented members found themselves squarely in the cross-hairs of this bureaucratic predisposition to public ownership of bridges, and the US DRIC Proponents sacrificed them and their due process rights and their guarantee of protection under NEPA.

83.     In 2004, Defendants published a Planning/Need Feasibility ("P/NF") Study that purported to forecast future border traffic.

84.     To falsely justify building the DRIC bridge, Defendants prepared unsupportable and grossly exaggerated traffic growth projections as part of a 2004 Planning/Needs Feasibility Study that suggested a substantial increase in traffic every year.

85.     However, the US DRIC Proponents had actual knowledge that traffic across the Detroit/Windsor border has been declining steadily since 1999.

86.     The traffic study used by the US and Canadian DRIC Proponents was based upon traffic projections commencing in 1998.

87.     Incredibly, those projection numbers were not amended to reflect that actual traffic numbers during the study years were proven to be grossly exaggerated by actual physical

counts of vehicles crossing the border. Even more incredibly, Defendants used these same projections in the 2008 Final EIS, for the flawed argument that the new DRIC bridge is needed.

88.    Actual traffic volumes on both the Ambassador Bridge and at all the other crossings in the area have been in decline since 1999. This trend was solidly in place long before the world-wide financial meltdown took its effect.

89.    Actual traffic numbers are compiled each year by the operating crossings. Those actual traffic numbers clearly demonstrated that the projections of the P/NF traffic study were preposterous; yet the US DRIC Proponents claimed, without supporting authority, that this trend would immediately reverse itself, and that by the year 2020, traffic volumes would exceed existing crossing capacity.

90.    The US DRIC Proponents apparently concluded that their traffic projections should not be concerned with proven facts compiled by third parties in the ordinary course of their businesses and accordingly cited the P/NF Study as supporting the need for the new DRIC bridge.

91.    In fact, the traffic projections contained in the P/NF Study serve as the cornerstone of Defendants' arguments in favor of a new border crossing despite the continued decline of border traffic.

**E.    The 2005 Evaluation of Illustrative Alternatives**

***The Outcome of the EIA Was Improperly Influenced by Political Considerations***

92.    The US DRIC Proponents then announced that they were considering three potential locations for the new DRIC bridge —the Belle Isle area (north and east of the existing Ambassador Bridge), the so-called Downriver area (south of the existing Ambassador Bridge), and the Delray neighborhood of Southwest Detroit (in close proximity to the existing Ambassador Bridge).

93.     The US DRIC Proponents announced that they would begin a process they called the "Evaluation of Illustrative Alternatives" process ("EIA") of reducing the potential bridge locations which the US DRIC Proponents referred to as the "Illustrative Alternatives."

94.     The EIA process of the US DRIC Proponents consisted of systematically rejecting all crossings except those in the US that could connect with the terminus location of Brighton Beach in Canada, which had already been selected by the Canadian DRIC Proponents to avoid the alleged disruption to the middle class, white neighborhood of Windsor, Ontario that would result if a bridge were to be located there.

95.     The Governor of Michigan, Jennifer Granholm, announced that the State of Michigan through MDOT would not allow the DRIC bridge to be located in any of the so-called Downriver areas of metropolitan Detroit which have a predominately middle class, white population.

96.     This announcement came in the wake of strong opposition from the largely white Downriver communities to construction of a new bridge in their neighborhood.

97.     The only locations that were acceptable to the Governor's office and MDOT were locations in the low income, minority populated Delray residential area of Southwest Detroit.

98.     Acceptance of this position by the US DRIC Proponents was a violation of the environmental justice guarantees of NEPA and has caused and continues to cause damage to the persons represented by the Association Plaintiffs.

99.     Defendants not only failed to conduct adequate reviews of the environmental impact of the "Illustrative Alternatives," but literally gave to the Canadian DRIC Proponents the power to select the final bridge site despite the protections of NEPA.

100.    Political considerations so dominated the EIA, that Defendants failed to objectively and fairly apply their statutory and regulatory requirements within the scope of FHWA's authority. Defendants made a political decision in total disregard for the process or protections of NEPA and at the sacrifice of the Association Plaintiffs and their members and DIBC.

101.    Defendant Steele abrogated his obligations as the Michigan Division Administrator of FHWA in favor of pleasing the Canadian governments that comprised the Canadian DRIC Proponents.

102.    Defendant Steele admitted in a two-page letter dated November 10, 2005 that the Second Span of the Ambassador Bridge ranked high among U.S. alternatives, but was being eliminated from further study in the U.S. on the basis of Canadian desires, not environmental factors.

103.    Defendant Steele ignored the best interests of the United States and the Delray community of Southwest Detroit and arbitrarily endorsed the Canadian preference and adopted it as the position of FHWA.

104.    Defendant Steele abrogated his duties as the Michigan Administrator of the FHWA in order to second guess the determination of the U.S. State Department, issued by letter dated November 4, 2005, that building the DRIC bridge in its projected location would fail to bring redundancy or "fiscal [sic] security" to the border crossing.

105.    The alleged environmental concerns of the Canadian DRIC Proponents that Windsor should not be a landing site for an international bridge were disingenuous.

106.    Steele adopted what he believed to be the position of Canada that Canada would not allow a bridge span to land in Windsor, Ontario because there would be no direct connection to the Canadian highway system.

107.    In fact, Canada had already committed to connect the Ambassador Bridge to the Canadian highway system without regard to the Second Span of the Ambassador Bridge.

108.    Defendant Steele knew or should have known that Canada would not suffer any environmental impact from the Second Span because Canada had already committed to all land based development required for the Second Span.

109.    In making his decision, Defendant Steele disregarded that building a new DRIC bridge in the United States would render the three direct highway connections that USDOT and MDOT were still completing to the Ambassador Bridge totally wasted.

110.    By inappropriately delegating their responsibilities under NEPA to the Canadian DRIC Proponents, Defendants subverted the NEPA process and evaded their statutory responsibility to the American people to consider all environmental impacts.

111.    By inappropriately delegating their responsibilities under NEPA to the Canadian DRIC Proponents, Defendants subverted the NEPA process and evaded their statutory responsibility to the American people to consider every reasonable alternative, including the "do nothing" alternative concerning a new border crossing.

### *The Second Span of the Ambassador Bridge Was Improperly Dismissed as a Practical Alternative*

112.    The US DRIC Proponents improperly dismissed the Second Span crossing as a viable alternative to the selected DRIC bridge Delray location by falsely relying upon statements made by the Canadian DRIC Proponents that upgrading the eleven (11) kilometers of roadway between the Ambassador Bridge to Canadian highway 401 would have a disproportionate impact

on the predominately middle class, white community of Windsor.  Immediately after the Ambassador Bridge location was dismissed by the US DRIC Proponents as a reasonable alternative, Transport Canada and the Ontario Ministry of Transportation recommended that nine (9) kilometers of the exact same road be upgraded to service the proposed DRIC bridge location. Simply put, the NEPA process was fatally tainted by the US DRIC Proponents allowing the protections of NEPA to be hijacked by the Canadian DRIC Proponents who have no statutory obligations or responsibilities to the American people under NEPA.

113.    The EIA's elimination of the Second Span of the Ambassador Bridge is just one example of Canada's undue influence over the outcome of the DRIC process.  Upon information and belief, numerous important decisions regarding the proposed DRIC bridge were made by a Steering Committee that included members from both U.S. and Canadian government agencies. Many of these decisions served the interests of Canada, but not the best interests of the United States, and certainly not the best interests of the minority community of Delray.

114.    Defendant Steele's abrogation of his duty under NEPA and Governor Granholm's politically based elimination of middle class, white communities eliminated from consideration all locations other than the historic, minority populated, economically challenged Southwest Detroit Delray neighborhood.

115.    The residents of Delray faced the same—and often worse—adverse impacts from the construction of a new border crossing as Downriver or Windsor residents.  But the poor, minority population in Delray lacked the political clout to get their community removed from Defendants' list of alternatives. They were sacrificed for the benefit of the predominately white communities in the Downriver area and Windsor, Ontario.

**F.    The Draft Environmental Impact Statement**

*The DEIS's Environmental Review Was Utterly Inadequate in Numerous Respects*

116.    Defendants continued to rush to their predetermined result by releasing the DEIS in February 2008, the Final EIS in November of the same year, and the ROD in January 2009, despite the fatal flaws of their predetermined alleged "process."  Upon information and belief, the reason for this rush to judgment is political pressure from the Canadian DRIC Proponents.

117.    After US DRIC Proponents narrowed the number of possible locations for their new DRIC bridge to one, they began a pro forma NEPA environmental review.

118.    FHWA named itself the lead agency to pass on the adequacy of the DRIC environmental process despite the fact that FHWA, as a partner of the DRIC project, had drafted the environmental review on which it was passing judgment.

119.    In February 2008, FHWA and MDOT released a DEIS that purported to analyze the potential environmental effects of the proposed DRIC project in the predetermined location of Delray.

120.    Consistent with the EIA—but inconsistent with NEPA, Section 4(f) of the Department of Transportation Act and their implementing regulations—the US DRIC Proponents analyzed only the Delray community of Southwest Detroit as a potential site.  Every build "alternative" included in the DEIS proposed a new bridge, customs plaza, and interstate interchange in Delray, with only minor variations in the configuration of the facilities.

121.    The suggested need for the DRIC project continued to rely on the false 2004 traffic forecasts published as part of the P/NF Study.  No updated traffic data was included in the DEIS calculations, although Plaintiff DIBC repeatedly requested that the US DRIC Proponents conduct a new and accurate traffic study.

122.    By November 2007, the Canadian DRIC Proponents had already determined to seek new "investment grade traffic and revenue forecasts" for the proposed DRIC bridge. Request for Proposals Traffic and Revenue Forecaster Windsor Gateway Project ("RFP") at 1. The schedule contained in the RFP indicated that this new traffic forecast would be completed in June 2008. *See* RFP at 12.

123.    Upon information and belief, this new traffic study was being conducted because the Canadian DRIC Proponents recognized that financiers could not be expected to rely upon the outdated and discredited 2004 traffic projections that time had proven to be grossly overstated.

124.    Nevertheless, the US DRIC Proponents steadfastly refused to withdraw their DEIS and conduct a new traffic study or even rely on the future traffic study that the Canadian DRIC Proponents were advocating in order to attract financing for the DRIC Bridge.

125.    In simple terms, the old traffic study that had been proven grossly overstated by actual traffic numbers was still "good enough" for NEPA purposes and "good enough" to support the death sentence for the Delray neighborhood of Southwest Detroit, and "good enough" for the Plaintiff Associations and their respective members, but it was not good enough for Wall Street and Bay Street financiers.

126.    Equally as incredible, the DRIC Draft Environmental Impact Study virtually ignored a massive development for which environmental approval had already been sought that was to be located approximately one mile from the proposed site of the DRIC plaza.  FHWA and MDOT (the other U.S. Partner in the DRIC process) had for years been developing plans for the 169-acre expansion of an existing railyard known as the Detroit Intermodal Freight Terminal ("DIFT") project.

127. Together, the DIFT and DRIC projects will occupy an enormous amount of contiguous land in Southwest Detroit, drawing commercial traffic between the DIFT and the DRIC bridge. Nevertheless, the combined or cumulative environmental impacts of these projects received little to no attention in the US DRIC Proponents' DEIS.

### The DRIC Proponents Misled the Southwest Detroit Community About the Impacts of the DRIC Project

128. The US DRIC Proponents directly violated the Executive Order on environmental justice and applicable guidance by not disclosing to the public the DRIC project's highly adverse and disproportionate impact on the low-income, minority population living in Delray and Southwest Detroit. The absence of this information prevented the public, and particularly the residents of Delray and Southwest Detroit, including the Plaintiff Associations and their members, from submitting effective comments on environmental justice issues during the DEIS comment period.

129. The DRIC DEIS also failed to consider the improvements to the access road and plaza expansion for the Blue Water Bridge in Port Huron and the plaza expansion for the Detroit and Windsor Tunnel.

130. Both the plaza expansion for the Blue Water Bridge and the plaza expansion for the Detroit and Windsor Tunnel projects were intended to increase traffic flow at the twin Blue Water Bridges and at the Detroit and Windsor Tunnel.

131. The US DRIC Proponents and both Transport Canada and Ontario Ministry of Transportation were involved in and recommended approval of the DEIS for the twinned Blue Water Bridge plaza expansion. However, the cumulative effects of the improvements to the Blue Water Bridge were ignored in the DRIC FEIS.

132.    The US DRIC Proponents knew or should have known about the Detroit and Windsor Tunnel plaza expansion project.  However, the cumulative effects of the improvements to the Detroit and Windsor Tunnel were ignored in the DRIC FEIS.

133.    The expansion projects for the twin Blue Water Bridges and for the Detroit and Windsor Tunnel would increase traffic flow at their crossings, calling into question the purpose and need for a new DRIC bridge.

134.    Upon information and belief, the US DRIC Proponents did not consider the effects of the twin Blue Water Bridges plaza expansion and the Detroit and Windsor Tunnel plaza expansion in order to avoid a further challenge to the purpose and need for the DRIC bridge in breach of their obligations under NEPA.

135.    The chapter in the DEIS discussing environmental impacts omitted or misstated a number of significant environmental impacts, including:

a.  disproportionate impacts to the low-income and minority residents of Delray;

b.  air quality impacts to Delray and Southwest Detroit residents;

c.  climate change effects of the DRIC project;

d.  transboundary impacts of the DRIC project; and

e.  the combined effects of the DRIC project, the DIFT project, the Blue Water Bridge plaza expansion project, the Detroit and Windsor Tunnel plaza expansion project, and the proposed new rail tunnels.

136.    The chapter in the DEIS that addressed properties protected under Section 4(f) of the Department of Transportation Act failed to consider reasonable and prudent alternatives—including the required no action alternative—that would have minimized or eliminated impacts

to those properties.  Indeed, Defendants had already eliminated numerous reasonable and prudent alternatives in the EIA without fully considering the impacts to Section 4(f) properties.

137.    During the public comment period for the DEIS, Plaintiffs (along with many other commenters) submitted extensive critiques of the DEIS that addressed all of the issues noted above, as well as numerous others, and concluded that the fatal flaws in the DRIC DEIS could not support a decision to proceed with the DRIC project.

138.    In light of these serious deficiencies, Plaintiffs asked FHWA to reconsider the need to build a completely new border crossing, to correct its flawed alternatives analysis, and to reevaluate the many adverse environmental effects a new crossing would have on Delray and Southwest Detroit.  FHWA declined to do so.

**G.    The Final Environmental Impact Statement**

139.    In late November 2008, the US DRIC Proponents made public their Final EIS, as well as their responses to the comments they had received on the DRIC DEIS.  The Environmental Protection Agency ("EPA") officially announced the public availability of the Final EIS in a December 5, 2008 Federal Register notice.  In a press release, FHWA boasted that the DRIC environmental review process had taken "about half the time needed for similar projects of this size . . . ."

140.    This boast was an unintended report card of predetermined decision-making by FHWA.  Defendants brushed aside the extensive comments submitted by Plaintiffs and others in order to complete the DRIC NEPA process before the change in the American presidency could remove the DRIC-predisposed FHWA political appointees from their positions of authority.

141.    The Final EIS made few substantive changes to the analysis of environmental effects in the DEIS.  As a consequence, the Final EIS is legally deficient in numerous respects.

26

*The Final EIS's Statement of Purpose and Need Depends on Erroneous Traffic Data*

142.    NEPA requires that all environmental impact statements "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. In this case, the blatant errors and misrepresentations present in the Final EIS's statement of purpose and need make it impossible for the public to evaluate the necessity of spending taxpayer money on the DRIC project, which will have significant adverse impacts on the environment and the Delray and Southwest Detroit communities.

143.    In stating this "need," the Final EIS improperly continued to rely on the erroneous traffic forecasts made during the 2004 P/NF process, erroneously insisted that those traffic projections were reasonable, and stated that "[n]o further data collection is needed nor will be conducted . . . ." Final EIS at F-138.

144.    To "address future mobility requirements," the US DRIC Proponents identified a "need" to "[p]rovide new border-crossing capacity to meet increased long-term demand"; "[i]mprove system connectivity to enhance the seamless flow of people and goods"; "[i]mprove operations and processing capability"; and "[p]rovide reasonable and secure border crossing system options in the event of incidents, maintenance, congestion, or other disruptions." Final EIS at 1-4.

145.    The decision of the US DRIC Proponents to ignore more recent and accurate traffic information fails to comply with FHWA's obligation to "insure the professional integrity, including scientific integrity, of the discussions and analyses" in the Final EIS (40 C.F.R. § 1502.24).

146.    In fact, the traffic projections relied on to support the Final EIS's claim of a "need to . . . [p]rovide new border crossing capacity to meet increased long-term demand" (Final EIS at 1-4) are demonstrably unreasonable.  DIBC showed in its comments that by the end of 2008— just four years into the DRIC traffic forecast—actual truck traffic on the Ambassador Bridge was more than *33% lower* than Defendants had predicted, and passenger vehicle traffic was an astounding *53% below* Defendants' projections.

147.    Traffic volumes this far below the traffic projections on which the US DRIC Proponents relied in issuing the ROD demonstrate that the reliance by the US DRIC Proponents on those flawed traffic projections is unsupportable.

148.    Asking Congress to spend more than a billion dollars on the DRIC bridge in light of actual traffic volumes being so far below the traffic projections upon which the need for a DRIC bridge is based is a fraud on the American taxpayer.

149.    Destroying a low-income minority neighborhood based upon the alleged need to handle traffic that demonstrably does not exist and will not exist for the foreseeable future is unconscionable.

150.    The DRIC traffic and capacity projections also failed to account for the additional physical capacity that would be created by the Second Span of the Ambassador Bridge.

151.    Because construction of the Second Span was and is a reasonably foreseeable event that will occur regardless of what happens with the DRIC project, relevant NEPA guidance required Defendants to include the Second Span in the "no-build" alternative.

152.    The DEIS, however, described the Second Span as a "variation" on the "no-build" alternative.  *See* DEIS at 2-36.  The Final EIS claimed that the Second Span was part of its

"travel demand modeling" (Final EIS at F-87), but still did not include it in any crossing capacity calculations.  No explanation is given for these material inconsistencies.

153.    Upon information and belief, the US DRIC Proponents of the DRIC bridge had become so entrenched in their desire to build a publicly-owned bridge rather than rely upon a privately owned bridge that had operated efficiently for 80 years, that the US DRIC Proponents simply approved the Final EIS without regard to the requirements of NEPA and then refused to correct their misdeeds.

154.    A prejudice against private ownership, especially when the right to that private ownership had been granted to DIBC by Congress itself, is not only an improper measure under NEPA, it is an improper collateral attack by the executive department of a right granted by the legislative department.

155.    When DIBC plugged actual updated traffic and capacity data into the same irreparably flawed traffic forecasting model used by Defendants as part of the PN/F Study, it demonstrated that even under the hyper-optimistic growth assumptions built into the DRIC model, traffic would not exceed the capacity of the existing and proposed crossings until approximately 2055—a date well beyond the 30-year planning horizon appropriate for infrastructure projects.

156.    Moreover, the world economy—and particularly the U.S. automotive industry— fell into a deep recession during 2008, leading to an even more significant drop in traffic on U.S. Canada border crossings than had already been happening.  The most recent, accurate data shows that truck traffic over the Ambassador Bridge was *15.1% lower* in 2008 than in 2007.

157.    This readily-available traffic data, which has been systematically ignored by FHWA and MDOT, completely disproves the claim in the Final EIS that a new border crossing

is needed "to meet increased long-term demand." Furthermore, the US DRIC Proponents'

continued reliance on outdated information and obsolete models flagrantly violates relevant

regulations requiring "the most efficient use of existing transportation facilities" (23 C.F.R. §

450.208(a)(10)), and cannot justify any expenditure of public funds on the DRIC project.

158.    The US DRIC Proponents' continued reliance upon traffic projections that have

been proven by actual facts to be grossly overstated demonstrates a bias by the FHWA that is the

antithesis of a full, fair and complete consideration of every reasonable alternative under NEPA.

### No Other "Needs" Described in the Final EIS Justify Construction of the DRIC Bridge

159.    In addition to the now-disproven need for greater capacity, the Final EIS

identified three more "needs" that allegedly justify the DRIC project:  (1) the need to "[i]mprove

system connectivity"; (2) the need to "[i]mprove operations and processing capability . . . at the

plazas"; and (3) the need to "[p]rovide reasonable and secure border crossing system options

. . . ." Final EIS at 1-4.

160.    On the U.S. side of the border, "system connectivity" is already being improved

through the $230 million Ambassador Bridge/Gateway Project that is creating a direct

connection between the Ambassador Bridge and the U.S. Interstate system as well as

accommodating the Second Span.  By the end of 2009, the Ambassador Bridge will have a direct

linkage to U.S. Interstates I-75, I-94 and I-96, dramatically increasing the crossing's efficiency.

161.    Canada made a reciprocal $300 million commitment to improve connectivity at

existing crossings between Detroit and Windsor in 2003.  To date, Canada has not made good on

its promise.  However, rather than requiring Canada to fulfill its prior commitment to improve

the connectivity at *existing* crossings, the US DRIC Proponents have embraced Canada's plans

to build a connection to Canada Highway 401 as part of the DRIC project and thereby waste

more than $230 million that the U.S. taxpayers are currently spending on connectivity to the Ambassador Bridge.

162.     If the Canadian DRIC Proponents linked their proposed new road to the Ambassador Bridge by adding only one more mile to that road, the US DRIC Proponents' perceived "need" for better system connectivity in Canada would be resolved and the alleged need for the DRIC bridge would be exposed to be false.

163.     Defendant Steele either disregarded these facts or was duped when he agreed with Canada that the Ambassador Bridge's Second Span would have too great an impact on Canada, when in actuality, the Canadian commitment of improved connectivity would avoid both the traffic impact and connectivity issues raised to Defendant Steele by Canada.

164.     Various improvements to "operations and processing capability" are underway on both sides of the Ambassador Bridge.  Many improvements have already been completed with positive results.  Other relatively simple and easily implemented solutions such as a commitment to full staffing by U.S. and Canadian customs officials would dramatically improve operations and process capabilities at the plazas without any investment in capital and without any impact on the environment.

165.     The DRIC Draft Environmental Impact Study and the US DRIC Proponents systematically ignored sustainable means of meeting the needs or purpose allegedly supporting construction of the DRIC bridge.

166.     The DRIC DEIS and the US DRIC Proponents ignored or misrepresented improvements at existing crossings that would constitute a sustainable means of meeting the alleged purpose and need for the DRIC bridge.

### *Blue Water Bridge*

167.    The US DRIC Proponents intentionally hid from consideration the effect that the expansion of the Blue Water Bridge access roadways and plaza would have on the purpose and need to build the DRIC bridge.

168.    Notes taken by Wilbur Smith Associates at a June 19, 2007 meeting of the US DRIC Proponents state the following: "The BWB [Blue Water Bridge] Team toned down the P & N [purpose and need] content [of the BWB DEIS] to better reflect the DRIC."  The toning down was done by "[d]iscussing more generally goods & services, national security, and traffic at a higher level."

169.    The attendees at the DRIC meeting where this deception was plotted were warned how to cover themselves about the purpose and need for the DRIC bridge in light of the Blue Water Bridge improvements as follows: "[It m]ust be clear in public involvement process that P&N [purpose and need was] tweaked based on the findings of the project."

170.    In other words, the Blue Water Bridge DEIS was altered by MDOT and the US DRIC Proponents to make sure that the traffic that MDOT anticipated crossing the twin Blue Water Bridges would not detract from the purpose and need argument that the US DRIC Proponents wanted to make to build the DRIC bridge.

171.    The notes made this deception clear:  "DRIC talks about induced demand—BWB [Blue Water Bridge] trying to step back from importance of traffic.  This is a critical component with DRIC as it is a blank slate.  The BWB has established traffic patterns to base the forecast off."

### Detroit and Windsor Tunnel

172.     The DRIC DEIS failed to consider the plaza expansion for the Detroit and Windsor Tunnel.  This expansion is intended to increase traffic flow at the Detroit and Windsor Tunnel, and yet the cumulative effects of the improvements to the Detroit and Windsor Tunnel were ignored in the DRIC FEIS.

### Second Span to the Ambassador Bridge

173.     The DRIC DEIS failed to fully consider the effect that constructing the New 6-lane Span to the 4-lane Ambassador Bridge would have upon the alleged purpose and need for the DRIC bridge, even though construction of the Second Span was included in the "no build" alternative.  This is a glaring example of intentional misrepresentation.

174.     The DRIC DEIS and the US DRIC Proponents systematically ignored the cumulative effects on the environment created by the Second Span of the Ambassador Bridge, the expansion of the roadways and plaza of the twinned Blue Water Bridges, and the expansion of the plaza of the Detroit and Windsor Tunnel.

175.     As well, the DRIC DEIS and the US DRIC Proponents conspired to separate the cumulative effects of the Detroit Intermodal Freight Terminal from affecting the environmental review of the DRIC DEIS.

176.     Prior to filing the DRIC DEIS, the US DRIC Proponents had already filed for environmental approval of a huge development only one mile away from the DRIC bridge for the creation of an intermodal freight center that would marry truck traffic from the DRIC bridge with rail traffic. The DIFT and the DRIC bridge are to be linked by a roadway that will itself impact the area.  Upon information and belief, the US DRIC Proponents slowed down the process of the DIFT approval to allow the DRIC project to receive a ROD first.

177.     The intentionally misleading acts of the US DRIC Proponents clearly demonstrate that the US DRIC Proponents did not follow either the provisions of NEPA or the spirit in which NEPA was passed.

178.     There is no real "need" for a new border crossing. The claim under the Final EIS that a new border crossing is needed to improve operations and processing capability at the existing plazas is a known falsehood.

179.     Defendant Steele admitted in sworn testimony before a select committee of the Michigan Senate on March 23, 2009, that the cause of border crossing problems is the failure of U.S. and Canadian customs to provide sufficient officers at the border and not a lack of crossing capacity, i.e., bridges.

180.     The final "need" for a new border crossing described in the Final EIS—the provision of "reasonable and secure border crossing system options"—is already being met by the seven existing Michigan-Ontario border crossings, including the Ambassador Bridge, the twin Blue Water Bridges, the Detroit and Windsor Tunnel, two freight rail crossings and a truck ferry.  All of these existing crossing system options are "reasonable and secure."  The Final EIS presented no data or information suggesting otherwise, and failed to substantiate Defendants' claimed "need" for a new crossing on these grounds.

181.     The US DRIC Proponents made "redundancy" the alleged goal for building the DRIC bridge when it became clear that traffic at the border continued its steep decline and could not support the need for a new bridge.

182.     Redundancy for security is also a false "need" because the U.S. Department of State sent a letter to Defendant FHWA in November, 2005 explaining that "the proximity of any new crossing to the existing crossings may mean that a problem at any one crossing may affect

all of the centrally-located crossings." Thus, a new DRIC bridge located less than two miles from the Ambassador Bridge does not ensure greater redundancy than the Second Span to the Ambassador Bridge, which was dismissed from DRIC consideration without appropriate reason.

183.    The US DRIC Proponents issued the ROD to achieve "fiscal" security. "Fiscal" security is not a criterion of NEPA. Assuming the US DRIC Proponents meant "physical" security and made a mistake in terminology in their rush to judgment, they are still wrong.

184.    If by "physical" security, the US DRIC Proponents are suggesting that the DRIC bridge would create redundancy, the United States Department of State in 2005 pointed out that the proposed DRIC location within a mile downriver from the Ambassador Bridge does not provide redundancy because any problem at one bridge would necessarily be visited upon the other bridge built so close together.

185.    Further, redundancy is similarly not a justifying criteria under NEPA.

186.    In other words, the US DRIC Proponents' alleged redundancy rationale could only be viable, if at all, for locations that are significantly further separated. Moreover, the DRIC bridge would connect only with I-75, so a problem on I-75 would close the DRIC bridge, while a problem on I-75 would not close the Second Span of the Ambassador Bridge because of its connections to I-96 and I-94.

### The Final EIS Fails to Consider a Reasonable Range of Alternatives

187.    NEPA and its implementing regulations—including FHWA's own NEPA regulations—also require that an agency consider a reasonable range of alternatives to its proposed action to allow for a comparison of potential effects on the environment in the environmental impact statement. 23 C.F.R. § 771.123(b); 40 C.F.R. § 1502.14.

188.    In this case, FHWA and MDOT did not conduct a valid alternatives analysis. Defendants used the 2005 EIA to eliminate from consideration all alternatives outside the Delray neighborhood.  As a result, the DEIS does not contain a range of alternatives as required, but rather a series of variations on the single build alternative located in the Delray neighborhood of Southwest Detroit.

189.    The 2005 EIA improperly excluded the Second Span of the Ambassador Bridge from further consideration as an alternative, even though the Second Span was among the highest-rated U.S. alternatives.  This decision, as already noted, was based on Canada's "firmly stated" objections and "unwillingness to consider" the Second Span.  *See* Two-page letter from Defendant Steele, Draft EIS at C-1 to C-2.

190.    In fact, the selection of the Delray neighborhood of Southwest Detroit was the inevitable result of the arbitrary and capricious decision of the US DRIC Proponents to yield to Canada's preferred location for a new crossing at the Brighton Beach area of Ontario to protect the middle class, white community in Windsor, Ontario.  Because a bridge can only be built so far across the Detroit River, the only feasible U.S. landing for a bridge with a predetermined landing at Brighton Beach, Ontario is the predominately low income, predominately minority community of Delray in Southwest Detroit.

191.    Canada's motives for choosing a Brighton Beach-Delray crossing, instead of the Second Span of the Ambassador Bridge, violate environmental justice guarantees of NEPA.  The Canadian terminus of the Second Span would be in the largely white Sandwich community in Windsor.  Brighton Beach, on the other hand, is primarily an industrial area, with few residences. Canada's decision to choose the Brighton Beach location and block the Second Span to protect a

white neighborhood in Windsor made it inevitable that the U.S. plaza of the DRIC bridge would destroy the predominantly minority Delray community of Southwest Detroit.

192.    The US DRIC Proponents' approval of Canada's unilateral selection of the location of the DRIC bridge improperly placed the fate of U.S. citizens in the hands of a foreign country which is acting unilaterally in its own self-interest.

193.    Defendants FHWA and Steele were charged with the responsibility to administer a fair and complete NEPA process. They owed a responsibility to the Plaintiff Associations and their respective members, to investigate, avoid or mitigate any violations of environmental justice guaranteed by NEPA.  Both Defendants FHWA and Steele have failed to discharge those responsibilities.

194.    Defendants effectively made Delray the only "appropriate location for a new crossing" by (i) ignoring the environmental consequences of the Second Span in the United States, (ii) heeding the politically-motivated declaration by Michigan's Governor that the Downriver and Bell Isle alternatives were "off the table," and (iii) bowing to Canada's demands that the Second Span  be excluded as an alternative,  Final EIS at F-106.  As a result, the Delray community will bear the brunt of the DRIC project, including hundreds of lost homes and jobs, community churches, businesses and non-profit organizations.

195.    The treatment of the Second Span of the Ambassador Bridge in the Final EIS is inconsistent and self-serving, just as it was in the DEIS.  The Second Span is described in the Final EIS as "a variation of the No Build Alternative" (Final EIS at 2-39), but the Final EIS did not consider the increased traffic capacity that can be accommodated by the Second Span or the additional physical crossing capacity the Second Span will provide as a variation of the No Build Alternative.

### *The Final EIS Does Not Adequately Address the Detroit Intermodal Freight Terminal*

196.    The Final EIS continued the determination of the US DRIC Proponents to downplay the combined impacts of the DRIC and DIFT projects along with the cumulative effects of the Blue Water Bridge plaza improvements, the Detroit and Windsor Tunnel plaza improvements and the two proposed rail tunnels.

197.    The DRIC Final EIS made no mention whatsoever of the cumulative environmental impacts of the twin Blue Water Bridges plaza expansion or the Detroit and Windsor Tunnel plaza expansion, or the proposed two new rail tunnels.

198.    The DRIC Final EIS barely mentioned the DIFT project, and it made no attempt whatsoever to describe the cumulative environmental impacts of the DIFT when considered together with the DRIC project—even though the DIFT project had been in the works since at least 2005 and is located in the same Southwest Detroit area as the DRIC project.

199.    To prevent the details of the DIFT project from appearing in discussions related to the DRIC project, FHWA and MDOT "gamed the system" by carefully but improperly coordinating the environmental reviews for the two projects.

200.    The DIFT Draft Environmental Impact Statement was published in May 2005. Yet, for the next three years, the US DRIC Proponents put the DIFT environmental review on the shelf while pushing the DRIC project forward.

201.    The US DRIC Proponents did not allow the DIFT study to move forward until after the DRIC DEIS had been published to avoid providing adequately detailed information about the DIFT project in the DRIC DEIS.

202.    This segmentation by deception is "gaming the system" to reach a predetermined result, in violation of the direction of Congress in passing NEPA.

203.    MDOT recently distributed materials addressing the DIFT project that indicate that there will be a direct roadway connection between the DIFT and the DRIC plaza, making the two projects literally "connected actions."

204.    Incredibly, the US DRIC Proponents still have not disclosed the future relationship between the DIFT and DRIC projects, which upon information and belief was always planned.

205.    Joseph Corradino of The Corradino Group and The Corradino Group of Michigan, Inc. (collectively "Corradino") was engaged by MDOT to perform professional planning, environmental, and engineering services to advance the DRIC bridge project.

206.    Corradino was the driving force for both the DIFT and the DRIC projects and environmental applications.

207.    Corradino's professional services, representation, and advice was followed by the US DRIC Proponents.

208.    The US DRIC Proponents have steadfastly treated the DIFT and the DRIC projects as completely unrelated even though (i) the US DRIC Proponents are common to both, (ii) Corradino as project manager is common to both, (iii) they are in the same immediate geographic area, (iv) they create an intermodal freight transportation infrastructure together, and (v) they are to be physically connected.

209.    The intended failure of the US DRIC Proponents to make an honest and forthright disclosure of the physical and operational connections between the DRIC and the DIFT projects borders on fraud.

210.    NEPA regulations mandate that connected or cumulative actions be discussed together in the same environmental impact statement, thereby allowing the public and decision

makers to fully understand the combined effects of the actions.  40 C.F.R. § 1508.25.  The US

DRIC Proponents have manipulated the NEPA process for both the DRIC and DIFT projects to

avoid a fulsome discussion of the combined environmental impacts of the two projects in

Southwest Detroit, in violation of NEPA.

### The Final EIS Improperly Postpones Aspects of the DRIC Environmental Review

211.    The DRIC Draft Environmental Impact Study and the US DRIC Proponents

systematically ignored or misrepresented the effects on the purpose and need for a new DRIC

bridge and the cumulative effects on the environment of major transportation projects with direct

effects on the DRIC project:

a.  **Expansion of the Blue Water Bridge Plaza**.  The US DRIC Proponents failed to

consider the effect of the expansion of the Blue Water Bridge plaza and the improvements to the

access road to the Blue Water Bridge on the purpose and need for the DRIC bridge.  Upon

information and belief, the US DRIC Proponents were even given instructions of the position to

take in the event that they were questioned about the failure to consider the effects of these

expansion projects on the purpose and need to build the DRIC bridge in order to cover up this

violation of NEPA.

b.  **Detroit International Freight Terminal ("DIFT").**   Prior to filing the DRIC

DEIS, the US DRIC Proponents had already filed for environmental approval of a massive

development only one mile away from the DRIC bridge for the creation of an intermodal freight

center that would marry truck traffic from the DRIC bridge with rail traffic. The DIFT and the

DRIC bridge are to be linked by a roadway that will itself impact the area.  Upon information

and belief, the US DRIC Proponents slowed down the process of the DIFT approval to allow the

DRIC project to receive a ROD first.

c.    **Detroit and Windsor Tunnel Plaza.** The DRIC DEIS failed to consider the plaza expansion for the Detroit and Windsor Tunnel.  This expansion is intended to increase traffic flow at the Detroit and Windsor Tunnel, and yet the cumulative effects of the improvements to the Detroit and Windsor Tunnel were ignored in the DRIC FEIS.

212.    The DRIC NEPA review was rushed from DEIS to Final EIS to ROD without allowing adequate time to study or to share with the public the full effects of the proposed DRIC project on the environment and the Delray community and Southwest Detroit.

213.    The Final EIS explicitly postponed discussion of numerous issues until the design stages of the DRIC project that will occur at some undetermined time in the future.

214.    The Final EIS improperly avoids discussing these impacts by excluding from the requisite NEPA environmental review the inescapable environmental harms that will not be known until after the design of the bridge is finalized.

215.    For example, the choice between a suspension bridge and a cable-stay bridge will not take place until the "design phase" of the DRIC project, even though that decision will impact local birds, the ecology of the Detroit River and the area's aesthetic values.

216.    Additionally, the length of the proposed DRIC bridge makes it impossible for a suspension bridge to avoid the placement of a pier in the Detroit River, a fact that will create numerous environmental impacts not addressed at all in the Final EIS.

217.    The Delray community is within an "Empowerment Zone"—an area of regulatory relief and tax incentives created by the U.S. Department of Housing and Urban Development to promote community revitalization by helping local businesses provide more jobs to local residents. The Final EIS stated that FHWA and MDOT will make "efforts" to relocate the 43 businesses destroyed by the DRIC project within the same "Empowerment Zone," but the

agencies did not specify what those efforts might entail.  Many of those businesses chose their current location specifically to reap the benefits of the local Empowerment Zone.

218.    In fact, the "Green Sheet" summarizing mitigation options for the DRIC project admitted that it merely "contains the project mitigation measures being considered at this time," making clear that those "items may be modified" at any time and leaving the public unable to comment on the lack of a firm commitment to mitigation.

219.    The Final EIS included a DVD that described a "vision" for the Delray community that included such things as new "baseball, soccer and football fields, a picnic area, and walking trail."

220.    On information and belief, this same video was shown to Delray residents during an October 29, 2008 community meeting to buy their support of the DRIC bridge.  But the Final EIS does not include any such mitigation in Delray.

221.    After creating public support by false promises, FHWA ultimately issued a letter claiming that the DVD should not have been included as part of that document.

222.    The release of this pie-in-the-sky video and FHWA's subsequent efforts to disavow it after receiving the benefit of the public support it created is yet another example of the US DRIC Proponents "gaming the system" in violation of NEPA and illustrates how Delray neighborhood residents have been misled by intentionally empty promises of revitalization should they support a DRIC bridge.

### The Final EIS Does Not Adequately Address Environmental Justice Issues

223.    Defendants completely ignored environmental justice by eliminating from consideration all alternative locations but for the underprivileged, heavily-minority Delray community of Southwest Detroit.  The US DRIC Proponents' 2005 Evaluation of Illustrative

Alternatives study was a sham intended to reach a predetermined conclusion for improper political considerations at the expense of the residents and businesses of Delray and Southwest Detroit.

224.    Environmental justice issues are governed by Executive Order 12,898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations," which requires federal agencies to identify and address any "disproportionately high and adverse human health or environmental effects" that its programs or activities might have on minority or low-income populations, to ensure that such populations are not subjected to discrimination by such programs or activities, and to promote effective public participation. *Id.* §§ 1, 2, 5.

225.    Applicable NEPA guidance states that when a project has "disproportionately high and adverse" effects on low-income and minority populations, that fact "should heighten agency attention to alternatives (including alternative sites) . . . ." Council on Environmental Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act* (1997) at 10. Appendix D of the DEIS separately promised that FHWA and MDOT would determine whether "other, additional alternatives to the proposed action" might "avoid or reduce the impact to low-income or minority populations." DEIS at D-2.

226.    The DEIS plainly failed to comply with applicable legal authorities on environmental justice. It also did not fulfill its own promises regarding environmental justice. As an initial matter, no disproportionately high or adverse impacts were identified, and no mitigation measures were proposed, until the Final EIS. Consequently, the public was not able to review the US DRIC Proponents' environmental justice findings during the DEIS comment period.

43

227.    The Final EIS admitted, for the first time, that the DRIC project would have a disproportionate negative impact on the low-income, minority population in Delray and Southwest Detroit who will bear the brunt of the substantial economic, environmental, social and cultural degradation associated with the DRIC project.

228.    Contrary to applicable legal authorities, the Final EIS did not consider any alternative locations outside Delray for the proposed DRIC bridge and plaza, nor did it put in place sufficient mitigation or enhancement measures to counteract the project's adverse effects on the community.

229.    Moreover, the Final EIS Green Sheet claimed that the listed "Community Enhancements" are being considered "above and beyond what is required mitigation for [the DRIC] project" presumably to fulfill the agencies' obligation to "avoid, minimize and/or mitigate" impacts to environmental justice communities in Delray and Southwest Detroit.

230.    The US DRIC Proponents then claimed in the ROD that it would be illegal for them to spend federal funds on mitigation or enhancements not directly related to project impacts.

231.    In other words, the US DRIC Proponents promised the citizens of the Delray community of Southwest Detroit that they would provide all sorts of perks and incentives and then hid beyond an alleged legal impossibility when it was time to produce. This is a bait and switch scheme that should not be countenanced under NEPA.

232.    Defendants have prominently claimed in presentations to Delray neighborhood residents that building the DRIC bridge "[w]ould attract and/or retain 25,000 jobs statewide," and that without the DRIC project, the result would be "[f]urther loss of jobs statewide and regionally."

44

233.    These employment forecasts did not account for the construction of the Second Span of the Ambassador Bridge, which would bring the same benefits to the Delray and Southwest Detroit community, while imposing far fewer burdens on residents than the DRIC bridge.

234.    The US DRIC Proponents' presentations to Delray residents included scare tactics such as falsely claiming that failure to construct the DRIC bridge would cause "[f]urther loss of jobs statewide and regionally" and "[m]ore abandoned industrial sites."  Final EIS Power Point Presentation, Page 29. This representation is patently untrue and intentionally deceptive.

235.    In sum, Defendants have not only failed to comply with their environmental justice obligations, they have actively misled the low-income, minority residents of the Delray community who will be directly, adversely and disproportionately affected by the DRIC project.

### The Air Quality Impacts in Delray Receive Insufficient Attention in the Final EIS

236.    After issuance of the DEIS, the EPA raised a number of concerns about the air quality impacts the DRIC project would have on the Delray community, including impacts to sensitive receptors like Southwestern High School, where individuals are particularly susceptible to adverse changes in air quality.  Based on these concerns, the EPA recommended an analysis of air quality mitigation options for both the construction and operation of the proposed DRIC bridge.

237.    In spite of the shortcomings of the DEIS's air quality analysis, the Final EIS did not respond adequately to the EPA's comments and recommendations, and contained little in the way of a commitment to mitigate the DRIC project's adverse air quality impacts.  The Final EIS furthermore failed to adequately quantify the impact of Mobile Source Air Toxics ("MSATs") that would be generated as a result of the DRIC project.

238.    The Final EIS's facile assertion that "air quality will improve . . . due to ongoing improvements in engines and fuels" misses the point.  Any project will experience air quality improvement due to improvements in engines and fuels.  NEPA requires Defendants to determine and disclose how the DRIC project will affect air quality when compared to the no action alternative.  That obligation cannot be circumvented by citing supposed improvements in air quality that will occur regardless of whether the proposed action is undertaken.

239.    The Final EIS's contention that the preferred alternative would cause "a split of traffic and, therefore, of air quality emissions, between the Ambassador Bridge and the new [DRIC] bridge" is intentionally misleading.

240.    An alleged improvement of air quality nearer the Ambassador Bridge does not absolve Defendants of their NEPA responsibility to analyze and describe the negative air quality impacts in Delray, where the DRIC bridge would be located. Further, the Final EIS does not adequately establish those alleged improvements.

241.    In these and numerous other ways, the DRIC environmental review process violated NEPA.  Accordingly, the agency action taken on the basis of that review is arbitrary, capricious, an abuse of discretion and contrary to law.

### The Final EIS Neglects Feasible and Prudent Alternatives, Rendering Its Section 4(f) Analysis Fundamentally Unsound

242.    Section 4(f) of the Department of Transportation Act prohibits approval of a transportation project that requires "the use of publicly owned land of a public park, recreation area, or . . . land of an historic site of national, State, or local significance," unless "no prudent and feasible alternative" exists, and the DRIC Proponents engage in "all possible planning to minimize harm" to protected property.  49 U.S.C. § 303(c).

243.    The Final EIS acknowledges that the DRIC project will require the destruction or use of a number of historic properties and recreational resources protected by Section 4(f), including: St. Paul African Methodist Episcopal Church, the first and only surviving African American church in the area and a well-recognized fixture of the community's heritage; historic Kovacs Bar, a long-time social and cultural establishment in Delray; Frank Beard School, a building dating from the nineteenth century; South Rademacher Community Recreation Center, and several community playgrounds and playlots.

244.    Ignoring the clear substantive mandates of section 4(f), the US DRIC Proponents did not select the feasible and prudent "no-build" alternative, even though that alternative would avoid the use of these valuable parkland, historic sites, and recreational areas.

245.    Upon information and belief, the US DRIC Proponents' decision not to select the "no-build" alternative was based on the false assumption that taking no action would fail to provide sufficient capacity to meet future border-crossing traffic needs.  That assumption unreasonably relied on traffic projections that the US DRIC Proponents knew or should have known were grossly exaggerated. The study predicted truck volumes on the Ambassador Bridge for calendar year 2008 that were 33% higher than actual 2008 traffic counts for that year.

246.    The deficient traffic study also materially understated future border capacity by failing to account for the Second Span of the Ambassador Bridge.

247.    The Second Span of the Ambassador Bridge is part of a proper "no-build" alternative because:

    a.    It is unquestionably feasible;

    b.    The EIA ranked it second in terms of constructability and cost-effectiveness;

c.  FHWA funded the Ambassador Bridge/Gateway Project in anticipation of accommodating the Second Span;

d.  The Second Span will meet the requisite transportation needs of the project;

e.  The Second Span was listed "among the best performers in Regional Mobility," DRIC Study, *U.S. Evaluation of Illustrative Alternatives*, Volume 1, § 5.3.8, at S-41, S-47 to 48; DRIC Study, *U.S. Evaluation of Illustrative Alternatives*, Volume 2, at 184, 190; and

f.  The Second Span was the highest-ranking U.S. option in terms of community and neighborhood impacts, consistency with local planning, and protecting the natural environment.  *Id*.

248.    The Second Span was excluded from further study in 2005 because Canadian officials refused to consider it.

249.    FHWA and MDOT's unlawful acquiescence to Canada's demand to exclude the Second Span not only eliminated a highly rated U.S. alternative, it also foisted on the Delray community of Southwest Detroit environmental impacts far more damaging than those that the Second Span would have imposed on Windsor, Ontario.  This outcome is incompatible with the substantive requirements of Section 4(f).

250.    Furthermore, the US DRIC Proponents have unlawfully failed to consider the Section 4(f) impacts of other alternatives—particularly the Downriver and Belle Isle Illustrative Alternatives, which were improperly rejected for political reasons in 2005.  Section 4(f) regulations required the agency to consider whether these alternatives would have caused less "overall harm" to such properties than the Delray neighborhood alternative.  23 C.F.R. § 774.3(c).

48

251.    The "least overall harm" determination mandated by FHWA regulations involves particularized consideration of a list of factors, including severity of harm, significance of the Section 4(f) property, and impacts to resources not protected by Section 4(f).  23 C.F.R. § 774.3(c)(i)-(vii).  Furthermore, in cases where FHWA undertakes this analysis, its review must be documented in the Section 4(f) evaluation.  23 C.F.R. § 774.7(c).

252.    In violation of this mandate, Defendants eliminated the Downriver and Belle Isle alternatives without determining their effect on Section 4(f) properties and without considering whether those alternatives were feasible and prudent under Section 4(f).  For these reasons alone, the US DRIC Proponents' Section 4(f) evaluation does not meet the requirements set out in the Department of Transportation Act or FHWA's implementing regulations.

253.    Additionally, if a full Section 4(f) evaluation of the Downriver and Belle Isle alternatives demonstrated that one or both of those locations were feasible and prudent alternatives to the Delray neighborhood location in Southwest Detroit, the US DRIC Proponents would be required to select the alternative with the least overall impact on Section 4(f) properties.  Because FHWA never engaged in this analysis, it cannot claim to have complied with the substantive requirements of Section 4(f).

254.    The 2005 Draft Environmental Impact Statement for the DIFT project listed at least five Section 4(f) protected properties that are not mentioned at all in the DRIC Final EIS. Failure of the Final EIS to discuss the combined effects on Section 4(f) properties caused by the DRIC project and the DIFT project is illustrative of the failure of the Final EIS to meet  Section 4(f) requirements.

255.    For these and other reasons that will be presented at the appropriate stage of litigation, the US DRIC Proponents' proposed use of protected parkland, recreational areas, and historic sites is in violation of Section 4(f) of the Department of Transportation Act.

**H.    Public Comments on the Final EIS**

256.    FHWA accepted comments on the Final EIS until January 5, 2009.  Only Seven (7) working days later (January 14th) , FHWA issued a document entitled "DRIC FEIS Notes on Comments."  That document purported to summarize, in table form, the comments received by FHWA and MDOT regarding the Final EIS, and to respond to those comments.

257.    Upon information and belief, this 7-day rush to judgment was to "Beat the Clock" before President Obama was sworn in as President and before the political appointees at US DOT and FHWA would be relieved of their power to judge their own EIS.

258.    Upon information and belief, the US DRIC Proponents were concerned that their DEIS and their deficient NEPA process would not have withstood the scrutiny of their successors from the Obama administration who may not share their prejudices for the DRIC project.

259.    The US DRIC Proponents' disregard of Plaintiffs' comments to the DEIS was an abrogation of the US DRIC Proponents' obligations under NEPA. They literally threw the rights of the Plaintiff Associations and their members under a political bus.

260.    Plaintiff DIBC's extensive comments on the Final EIS received virtually no substantive response in the US DRIC Proponents' "Notes on Comments" document.

261.    At least the US DRIC Proponents were consistent.  They made absolutely no attempt to address the actual traffic data that demonstrated that the steeply declining traffic between Detroit and Windsor has continued unabated in a downward spiral and did not re-

examine the purpose and need for a new DRIC bridge in light of declining rather than increasing border traffic.

**I.      FHWA's Record of Decision**

262.    On January 14, 2009, FHWA issued its ROD selecting a future location of the proposed DRIC bridge as the preferred alternative described in the Final EIS. The issuance of the ROD constituted final agency action for purposes of NEPA and the APA.

263.    The inadequacies in Defendants' NEPA review process have resulted in the arbitrary and capricious agency decision to issue a ROD allowing Defendants to proceed with the DRIC project.

264.    The ROD violates the substantive provisions of Section 4(f) of the Department of Transportation Act by approving a project that adversely affects protected property when feasible and prudent alternatives are available.

265.    The Defendants, that is the US DRIC Proponents, formally approved the construction of the new Detroit River International Crossing ("DRIC") bridge—even though all the relevant evidence demonstrated that the DRIC bridge is not needed, and even though the DRIC bridge location would unnecessarily obliterate a historic Detroit community that is home to a largely minority, low-income population whose interests are represented here by the Plaintiff Associations.

266.    The ROD did not correct any of the fatal flaws in the DEIS and Final EIS that had been pointed out by commenters.  With consistency its only virtue, the ROD, just like the DEIS and Final EIS, (i) relied on demonstrably erroneous traffic forecasts, (ii) adopted the improper alternatives analysis in the DEIS and Final EIS, (iii) did not consider feasible and prudent

alternatives as mandated by NEPA Section 4(f), and (iv) did not resolve any of the other problems raised in the comments to the DEIS.

267.    The ROD even introduced new errors into the NEPA process by revealing information that had not been disclosed in the DEIS or Final EIS.

268.    For example, the ROD stated for the first time that FHWA was legally prohibited from spending the promised $21 million in federal funds on community enhancements.  ROD at 38.  This is vital information that the residents of the Delray neighborhood of Southwest Detroit should have been clearly told; it was not something to be hidden and then disclosed in a pro forma fashion for the first time in the ROD.

269.    This was the final step in the "bait and switch" pulled by the US Proponents of the DRIC bridge to attain Delray community support for its bridge by making false promises of community development.  The US DRIC Proponents went so far as to produce and present a "Hollywood-slick" DVD presentation of the "new and improved" Delray community, complete with pictures of attractive new housing, green space and public parks and entertainment and sports facilities, only to have Defendant Steele withdraw the DVD from the EIS official binder **after** community approval.

270.    Upon information and belief, the production and presentation of the DVD was intended to influence those residents of the Delray neighborhood who were unsophisticated and of lower formal education. Once they were hooked, Defendant Steele withdrew the DVD and its promise of community improvement, and the ruse was successfully completed.

271.    The dates of these issues demonstrates the bait and switch in which the Delray residents were made promises of community improvements and then after the comment period

on the DEIS passed and the FEIS was signed, the community improvements promises were withdrawn:

      a.    In February 2008, the so-called Green Sheet, Section f stated that "[t]he FHWA and MDOT will partner with the City of Detroit and other federal, state and local agencies and cities to develop concepts by which enhancements can be made to Delray as it becomes the 'Host Community' for the DRIC project."

      b.    In March 2008, public meetings were held by the US DRIC Proponents at Southwestern High School in Detroit where the alleged community improvements coming to Delray along with the DRIC bridge were prominently displayed.

      c.    In May 2008, the DRIC DEIS 90-day comment period ended.

      d.    In November 2008, the FEIS was signed and Section f (community improvements) was deleted from the Green Sheet in the Project Mitigation Summary.

272.    Upon information and belief, the production and presentation of the DVD was intended to influence residents of the Delray neighborhood against the Second Span by comparison.

273.    Members of the US DRIC Proponents had publicly stated if that if the Second Span to the Ambassador Bridge were built, it was unlikely that the DRIC bridge would be built.

274.    Those statements, coupled with the DRIC bridge DVD, were intended to unfairly and dishonestly prejudice the residents of the Delray neighborhood against the Second Span proposal so that the DRIC bridge could be built.

275.    The ROD flatly ruled out any community benefits agreement and ruled out the use of toll revenue to fund ongoing mitigation and enhancement, two items that Delray

community groups like the Plaintiff Associations have long advocated for their local members. *Id*. at 37.

276.    The ROD coined a new term to describe the purpose of the DRIC project:  "fiscal security."  ROD at 29.  This purpose for the DRIC project did not appear anywhere in the DRIC environmental review except the final ROD itself.

277.    Upon information and belief, the reason that the US DRIC Proponents coined this new term ("fiscal security") as the purpose and need for the DRIC project was that they knew that traffic across the border was still continuing its steady and massive decline.

278.    Accordingly, the US DRIC Proponents used "fiscal security" as the answer to why a DRIC bridge is needed and even admitted that there was a "[r]ecent downturn in cross-border traffic" (as if a ten (10) year trend of declining traffic could legitimately be called "recent").

279.    The ROD provided no substantive response whatsoever to comments to the DEIS that had questioned the purpose and need for the DRIC bridge in light of a decade-long trend of declining traffic volumes.

280.    When Plaintiff DIBC and other commenters forced FHWA to recognize the absurdity of introducing "fiscal security" as an entirely new justification for the DRIC project in the ROD, the Defendant Steele mailed a letter to recipients of the ROD disavowing use of "fiscal security" as the purpose for the ROD.

281.    It is black letter NEPA procedural law that the lead agency cannot simply abandon its alleged purpose when it appears for the first time in the ROD and is subsequently criticized.

282.    Assuming that "fiscal security" was intended to be "physical security," the ROD disregards the opinion of the US State Department, which issued a letter to DRIC proponents dated November 4, 2005 that advised that the proposed location of the DRIC bridge would provide no greater redundancy than a Second Span to the Ambassador Bridge because of their physical proximity.

283.    Assuming that "fiscal security" means protecting financial revenues to be generated by a toll bridge, NEPA contains no such criteria as reasons for purpose and need.

284.    Defendant Steele has disregarded material requirements of NEPA to force a predetermined decision to build in Delray.

285.    Upon information and belief, Defendant Steele and the US DRIC Proponents orchestrated a bait and switch deception of Delray residents to entice their support during the NEPA process, only to pull the switch and remove the community improvements after it was too late.

286.    Upon information and belief, the US DRIC Proponents have denied due process rights of Plaintiff Associations who are residents of Southwest Detroit by disregarding the NEPA process in deference to the desires of the Canadian DRIC Proponents.

287.    In further deference to Canadian desires, FHWA disregarded public comments concerning the Canadian "investment grade traffic study" by asserting in the ROD that the Canadian study "was not used as part of the NEPA decision making process."  ROD at 29.

288.    FHWA was obligated under NEPA to consider all relevant and reasonably available information during the NEPA process but failed to do so.

289.    FHWA was obligated under NEPA to consider the actual traffic numbers compiled at the various border crossings that without question contradicted the traffic projections upon which FHWA was relying as the purpose and need for the DRIC bridge but failed to do so.

290.    FHWA was obligated to withhold the ROD until FHWA received and considered the Canadian "investment grade traffic study" but failed to do so.

291.    The DRIC project's disproportionately high and adverse impact on minorities is patently discriminatory.

292.    Comments on the Final EIS complained that FHWA had not properly considered environmental justice.  In response, the ROD asserted that although the DRIC project will inflict "disproportionately high and adverse" harms on the low-income and minority residents of Delray, those harms will not have a "discriminatory affect" [*sic*] on the Delray population.  ROD at 32.

293.    Because the US DRIC Proponents admitted that the DRIC bridge will cause "disproportionately high and adverse" harms on persons in a class be to protected by environmental justice guarantees, it is preposterous to then simply conclude that such harms will not have a "discriminatory affect [*sic*]".

294.    The very purpose for environment justice guarantees is to avoid "disproportionately high and adverse" harms to a minority, low income, protected part of the American citizenry.

295.    The ROD contained a final version of the Memorandum of Agreement ("MOA") between the Michigan State Historic Preservation Officer and FHWA pursuant to Section 106 of the National Historic Preservation Act.

296.    The MOA acknowledged that the DRIC project will have adverse effects on a number of historic properties, including Fort Wayne, a landmark that has stood since the 1840s. The MOA recites several measures that purport to mitigate damage to these historic structures, but provides no evidence that the US DRIC Proponents considered alternatives that would have avoided such damage altogether.

297.    Moreover, neither the ROD nor the MOA acknowledged the impact on historic properties in Southwest Detroit that would be caused by the DIFT project.  For reasons already discussed, the historic property impacts of the DIFT and DRIC projects should have been considered together for their combined impacts in a single, combined environmental impact statement.

298.    The Gateway Project, the Second Span, the twin Blue Water Bridges plaza expansion, and the Detroit and Windsor Tunnel expansion projects should have been considered when considering the purpose and need for the DRIC bridge.

299.    Plaintiffs have been forced to bring this action to challenge the environmental review of the proposal to build a DRIC bridge in the Delray neighborhood of Southwestern Detroit  for the reasons set forth in the Complaint, including that the environmental "review" (i) was done in furtherance of a predetermined outcome, (ii) was an arbitrary and capricious agency action, (iii) was done without consideration of the environmental justice obligations under NEPA and that (iv) all information that did not support Defendants' goal was systematically ignored or dismissed.

300.    If this Court fails to enjoin Defendants, Defendants will continue to push mindlessly ahead with the DRIC bridge proposal that would devastate the Delray neighborhood and a significant amount of land in Southwest Detroit, demolish historic properties, destroy

recreational areas and parks, relocate hundreds of homes, churches and businesses, eliminate hundreds of jobs, and violate NEPA's guarantee of environmental justice.

301.    The US DRIC Proponents prepared the DRIC DEIS and presented it to themselves in the form of the FHWA/US DOT, which elected itself lead agency to review the DRIC DEIS that it itself had drafted.  Not surprisingly, FHWA/US DOT approved its own draft, prepared the DRIC FEIS, and issued its Record of Decision.

302.    Even if, in the abstract, a federal agency can be both the proponent of and the decision maker for judging NEPA compliance, this Court must judge whether US DOT has denied to Plaintiffs their right to protection under NEPA and has denied to Plaintiffs their right to due process.  Dismissing the Second Span of the Ambassador Bridge which scored high on U.S. environmental impacts demonstrates the obvious bias of the decision maker to its own, competing proposal.

303.    Given the obvious bias of US DOT as a member of the US DRIC Proponents and the participation in the DRIC study with MDOT, Transport Canada and the Ontario Ministry of Transportation, NEPA's assurance of due process, NEPA protection of the environment, protection of U.S citizens and NEPA's guarantee of environmental justice has been trampled.

304.    Plaintiffs seek preliminary and permanent injunctive relief to prevent any further action on this expensive and destructive DRIC project.  The issuance of the ROD by US DOT was an agency action that was arbitrary and capricious and an abuse of discretion and not in accordance with law. 5 U.S.C. § 706(2)(A).

**COUNT I**
**NATIONAL ENVIRONMENTAL POLICY ACT**

305.    Plaintiffs re-allege and incorporate the statements in Paragraphs 1 through 303, above.

306.    As more fully set forth above, Defendants violated NEPA and the APA by issuing a ROD in reliance on a Final EIS that was arbitrary, capricious and contrary to law in at least the following respects:

a.    The Final EIS's Statement of Purpose and Need is not supported by the available evidence;

b.    The Final EIS's Statement of Purpose and Need relies on erroneous traffic data that prevents the public and decisionmakers from understanding the lack of an underlying need for the DRIC project;

c.    The Final EIS's Statement of Purpose and Need claims that the DRIC project is necessary on other grounds that are not supported by the record, and which do not justify construction of a new border crossing;

d.    The Final EIS's Alternatives Analysis did not include a reasonable range of alternatives, and does not adequately or accurately compare the preferred alternative to other reasonable alternatives, including the no action alternative;

e.    The location of the Final EIS's preferred alternative was predetermined before the initiation of the NEPA process, and was the result of Defendants' bias toward construction of a new crossing in the Delray neighborhood;

f.    The Final EIS's Environmental Impact Analysis did not adequately address the combined effects of the DIFT and DRIC projects, even though that project will affect the same Southwest Detroit neighborhoods as the DRIC project;

g.    The Final EIS did not consider the effects on traffic capacity of the Second Span, the Blue Water Bridges plaza expansion project, and the Detroit and Windsor

Tunnel plaza expansion project in its conclusion on the purpose and need for the DRIC bridge;

h.   The Final EIS did not adequately address environmental justice issues, including ways of avoiding disproportionately high and adverse effects on the low-income and minority populations living in the Delray neighborhood of Southwest Detroit, even though it acknowledged that the DRIC project will have such impacts;

i.   The Final EIS contained false or misleading promises of community enhancement measures in order to attract local support for the DRIC project;

j.   The Final EIS did not adequately address the air quality impacts of the DRIC project in the Delray and Southwest Detroit neighborhood, even though the EPA explicitly requested more detailed analysis of those impacts; and

k.   The Final EIS did not properly consider the combined air quality impacts of the DRIC and DIFT projects.

307.   As a result of the violations of NEPA and the APA described in this Complaint, the US DRIC Proponents' actions in approving the DRIC project are arbitrary, capricious and contrary to law, and must be reversed, set aside and remanded pursuant to NEPA and the APA.

**COUNT II**
**SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT**

308.   Plaintiffs re-allege and incorporate the statements in Paragraphs 1 through 303, above.

309.   Defendants violated Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303 and 23 U.S.C. § 138) by approving a plan that would use protected parkland, recreational areas, and historic sites, despite the existence of feasible and prudent avoidance alternatives, and by failing to engage in all possible planning to minimize harm, including the

consideration of alternatives less harmful to section 4(f) protected property.  More specifically, and without limitation, Defendants and the US DRIC Proponents:

    a.   rejected the "no-build" alternative, a feasible and prudent alternative to construction of the DRIC bridge that would have fewer impacts on properties protected by Section 4(f); and

    b.   excluded the Downriver and Belle Isle alternatives from further study in 2005 without fully considering whether those alternatives were feasible and prudent under Section 4(f), or whether they would have fewer impacts on Section 4(f) properties.

310.    For these reasons, any further action by Defendants, theUS DRIC Proponents, on the DRIC project would be in violation of Section 4(f), and should be preliminarily and permanently enjoined.

## COUNT III
## SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT

311.    Plaintiffs re-allege and incorporate the statements in Paragraphs 1 through 303, above.

312.    As more fully set forth above, Defendants violated Section 106 of the National Historic Preservation Act by failing to fully document the DRIC project's impacts on sites eligible for listing in the National Register of Historic Places, and by failing to consider alternatives that would have minimized or eliminated such impacts.

313.    As a result of the violations of Section 106 and the APA described in this Complaint, Defendants', the US DRIC Proponents', actions in approving the DRIC project are arbitrary, capricious and contrary to law, and must be reversed, set aside and remanded pursuant to Section 106 and the APA.

## PRAYER FOR RELIEF

On the grounds stated above, Plaintiffs respectfully request that the Court:

1.    Enter a declaratory judgment that:

    a.  FHWA acted arbitrarily, capriciously, and in violation of NEPA and the APA when it issued a ROD based on the Final EIS for the DRIC project;

    b.  FHWA acted arbitrarily, capriciously and in violation of Section 4(f) of the Department of Transportation Act when it selected a preferred alternative for the DRIC project based on the Final EIS;

    c.  FHWA acted arbitrarily, capriciously and in violation of NHPA when it selected a preferred alternative for the DRIC project based on the Final EIS;

    d.  FHWA acted arbitrarily, capriciously, and in violation of NEPA, Section 4(f) of the Transportation Act, NHPA, the APA, and applicable legal authorities on environmental justice when it failed to consider the combined or cumulative environmental consequences of the DRIC and DIFT projects and when it improperly delayed the DIFT EIS;

    e.  FHWA acted arbitrarily, capriciously, and in violation of NEPA, Section 4(f) of the Transportation Act, NEPA, the APA, and applicable legal authorities on environmental justice;

    f.  FHWA acted arbitrarily, capriciously, and in violation of NEPA, Section 4(f) of the Transportation Act, NEPA, the APA, and applicable legal authorities on environmental justice when it failed to consider the combined or cumulative environmental consequences of the DRIC project, the DIFT project, the twin Blue Water Bridges plaza expansion project, the Detroit and Windsor Tunnel plaza expansion project, and the two proposed new rail tunnels;

g.  FHWA acted arbitrarily, capriciously, and in violation of NEPA, Section 4(f) of the Transportation Act, NEPA, the APA, and applicable legal authorities on environmental justice when it improperly delayed the DIFT EIS in order to approve the DRIC FEIS and not take into account the combined or cumulative effects of including the DIFT EIS in their analysis of the DRIC FEIS;

h.  FHWA acted arbitrarily, capriciously, and in violation of NEPA when it approved the DRIC FEIS in light of the segmentation of environmental approvals orchestrated by FHWA itself;

i.  FHWA acted arbitrarily, capriciously, and in violation of NEPA, the APA, and applicable legal authorities on environmental justice when it actively misled the low-income, minority residents of the Delray and Southwest Detroit community who will be directly, adversely and disproportionately affected by the DRIC project;

j.  FHWA should have disqualified itself as lead agency for the DRIC EIS after it knew or should have known that Defendant Steele was acting as an advocate for the DRIC project rather than fulfilling his obligation of impartiality; and

k.  FHWA should have disqualified itself as lead agency for the DRIC EIS after it discovered or should have discovered that members of the agency began acting as advocates for the DRIC project rather than fulfilling their obligations of impartiality.

2.  Issue preliminary and permanent injunctive relief prohibiting Defendants, the US DRIC Proponents, from taking any action in reliance on the DRIC ROD, including but not

limited to the acquisition of any property in the Delray neighborhood that would be used for the DRIC project.

      3.      Issue permanent injunctive relief disqualifying FHWA from acting as the lead agency for the DRIC EIS;

      4.      Issue permanent injunctive relief, disqualifying USDOT from acting as the lead agency for the DRIC EIS.

      5.      Award Plaintiffs their costs, including reasonable attorneys' fees.

      6.      Grant any other relief that the Court deems just and proper.

Dated this 14th day of May, 2009.

Respectfully submitted,

_____

Anthony M. Alexis, DC # 384545
Kathryn Kusske Floyd, DC # 411027
Jay C. Johnson, DC # 487768
Mayer Brown LLP
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000 – telephone
(202) 263-3300 – facsimile

*Attorneys for Plaintiffs*

John C. Berghoff, Jr. IL # 181528
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 – telephone
(312) 701-7711 – facsimile

_____