UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATIN AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT, CITIZENS
WITH CHALLENGES, DETROIT ASSOCIATION
OF BLACK ORGANIZATIONS, DETROITERS
FOR PROGRESS, MANA DE METRO DETROIT,
MEXICAN PATRIOTIC COMMITTEE OF METRO
DETROIT, DETROIT INTERNATIONAL BRIDGE
COMPANY,

    Plaintiffs,

-vs-

Case No. 10-10082
Hon: AVERN COHN

The ADMINISTRATOR of the Federal Highway
Administration, in his official capacity, THE FEDERAL
HIGHWAY ADMINISTRATION, JAMES J. STEELE,
in his official capacity as the Michigan Division
Administrator of the Federal Highway Administration,
an individual,

    Defendants.
_____/

**MEMORANDUM AND ORDER STAYING PLAINTIFFS' MOTION FOR LEAVE TO TAKE DISCOVERY**

**I. Introduction**

This is an Administrative Procedures Act (APA) case involving a challenge to the Federal Highway Administration's (FHWA) January 4, 2009 Record of Decision (ROD) approving a proposed international bridge crossing in the Delray community in Detroit, Michigan. Plaintiffs include a number of community organizations with ties to the Delray community as well as the operators of the Ambassador Bridge, an international bridge crossing located approximately two miles from the proposed crossing. Plaintiffs claim

that defendants – the Administrator of the FHWA, the Michigan Division Administrator of the FHWA, and the FHWA (collectively "the FHWA")– failed to comply with the requirements of the National Environmental Protection Act (NEPA), Section 4(f) of the Department of Transportation Act (Section 4(f)), and Section 106 of the Historic Preservation Act when they issued the ROD.

Now before the Court is plaintiffs' Motion for Leave to Take Discovery and for Preliminary Injunction. For the reasons stated below, the Court in unable at this time to make an informed decision due to the current state of the Administrative Record (AR). Accordingly, plaintiffs motion will be stayed pending the FHWA's submission of additional documents. This Memorandum and Order sets forth a summary of the factual basis for plaintiffs' complaint and motion as well as the Court's understanding of the procedural requirements under the APA, the NEPA, and Section 4(f).[1] It will also explain why the current format of the Administrative Record (AR) lodged by the FHWA is insufficient, in the Court's view, to permit it to reach a decision on plaintiffs' motion at this time.

## II. Facts

### A. Background

The Detroit River International Crossing (DRIC) planning process officially began in 2001 when representatives from the Michigan Division of the FHWA, the Michigan Department of Transportation (MDOT), Transport Canada, and the Ontario Ministry of

---

[1]Neither plaintiffs nor defendants address the Historic Preservation Act in the papers filed with respect to the pending motions. The Act will not be addressed in detail here.

2

Transportation (collectively "the agencies") met to discuss border transportation needs. The agencies commissioned a planning study ("Planning Needs and Feasibility Study") which was completed in January 2004.  The Planning Needs and Feasibility Study concluded that additional capacity was needed for the border crossing between Detroit, Michigan and Windsor, Ontario.  According to the FHWA, the purpose and need for the new project was to "provide safe, efficient and secure movement of people and goods across the U.S.–Canadian border and to support the economies of Michigan, Ontario, Canada, and the United States."

The agencies considered several bridge, customs plaza, and associated highway connection proposals as well as the environmental effects that would result from each alternative.  In March 2003 the FHWA published a Notice of Intent to prepare an Environmental Impact Statement (EIS).  A Draft Environmental Impact Statement (DEIS) was published in February 2008.  After the public was given an opportunity to comment on the DEIS, a Final Environmental Impact Statement (FEIS) was published on November 21, 2008.  On January 4, 2009 the FHWA published a Record of Decision (ROD) approving a proposed bridge crossing, customs plaza, and highway connection in the Delray community in Detroit, Michigan.

## B. Procedural History

On May 14, 2009 plaintiffs filed this action in the United States District Court for the District of Columbia (Case No. 09-00897).  On November 23, 2009 the FHWA lodged a certified AR with the court (D.D.C. Doc. 27).  On November 25, 2009 plaintiffs filed a Motion for Discovery to Assure Completeness of the Administrative Record, (D.D.C. Doc. 28), and a Motion for Preliminary Injunction (D.D.C. Doc. 29).  On

3

November 25, 2009 the court granted the FHWA's Motion to Transfer Venue (D.D.C. Doc. 33) and the case was transferred to the Eastern District of Michigan. Plaintiffs' Motion for Reconsideration was denied (Doc. 3).

At a February 19, 2010 status conference, the FHWA stated that it wished to amend the AR. A certified AR was filed on April 16, 2010 (Doc. 14). The FHWA filed errata sheets on April 22, 2010, (Doc. 15), and June 25, 2010 (Doc. 20) correcting errors in the certified AR. The certified AR is contained on 14 DVDs. The content is divided into three indices with no discernable organizational structure. Moreover, the indices do not indicate the DVD on which each document is stored.

The FHWA has given the Court little detail regarding its methodology in compiling the AR. It states "[t]he AR includes the DEIS, the FEIS, and the ROD" along with "approximately 130,000 pages of emails, notes, reports, records of meetings, and other materials." It does not explain how it selected which emails, notes, reports, records of meetings, and other materials would be included in the AR and which would be excluded.

Plaintiffs also have not given the Court any insight into the protocol used by the FWHA when it produced the first certified AR to the District of Columbia District Court in 2009. However, plaintiffs have given the Court some insight into the compilation of the supplemented record submitted on April 16, 2010. In a March 11, 2010 letter to plaintiffs, the FHWA described its proposed search to identify additional relevant documents (Doc. 16, Ex. 8). The letter included a proposed search term list, but stated that the FHWA intended to screen out "all newspaper and periodical articles and to limit the dates to January 1, 2005 to January 16, 2009." It did not identify the FHWA

4

databases or employee records that would be searched. Plaintiffs responded by providing a vastly expanded list of proposed search terms, (Doc. 16, Ex. 10), and by objecting to the exclusion of newspaper and periodical articles, the date limitations, and the failure to specify the scope of the records to be searched, (Doc. 16, Ex. 9). The FHWA appears to have conducted their proposed search without responding to plaintiffs or incorporating their proposed changes.

On May 14, 2010 plaintiffs renewed their motions for leave to take discovery and for preliminary injunction (Doc. 16).

### III. Compiling the Administrative Record

What follows is the Court's understanding of the protocol for compiling an administrative record.

When an agency decision is challenged under the APA, a court must set it aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(b). In so doing, a court should consider whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co. 463 U.S. 29, 43 (1983). A reviewing court may not engage in de novo review of an issue before an agency, but must engage in a "thorough, probing, in-depth review" of the agency's decision. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971). Such review must be based on "the full administrative record before the
5

[agency decisionmakers] at the time [they] made [their] decision" and cannot incorporate post hoc rationalizations. Id. at 419-20.

The APA does not define the contents of an AR. However, it has been defined by several courts as "all documents and materials directly or indirectly considered by the agency." Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993); see also Maritel Inc. v. Collins, 422 F. Supp. 2d 188, 196 (D.D.C. 2006); Pacific Shores Subdivision California Water District v. U.S. Army Corps of Engineers, 448 F. Supp. 2d 1, 4 (D.D.C. 2006). Unlike some statutory schemes, neither the NEPA nor Section 4(f) provides agencies with guidance on compiling an AR. See 42 U.S.C. § 7607(d)(7)(A) (describing process for compiling AR in Clean Air Act cases); 42 U.S.C. § 9613(j), (k) (describing process in Comprehensive Environmental Response, Compensation, and Liability Act (Superfund) cases). Nor is there any guidance in the Code of Federal Regulations. But cf. 40 C.F.R. § 300.800-825 (providing guidance on compiling AR in Superfund cases); 40 C.F.R. Part 24 (describing process in Resource Conservation and Recovery Act cases). Moreover the Court is unaware of any internal FHWA guidance documents regarding the compilation of an AR.

However, there are a number of other government guidance documents addressing the compilation of an AR, including those of the Department of the Interior and the Environmental and Natural Resources Division of the Department of Justice. In the absence of laws, regulations, or policies that might bind the FHWA, these documents may be considered "best practices" guidelines for compiling an AR. The DOJ guidance says that an AR should include "all documents prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, even

though the final decision-maker did not actually review or know about the documents and materials." ENVIRONMENT AND NATURAL RESOURCES DIVISION, U.S. DEPARTMENT OF JUSTICE, GUIDANCE TO FEDERAL AGENCIES ON COMPILING THE ADMINISTRATIVE RECORD 3 (1999) [hereinafter DOJ GUIDANCE].  The Department of Interior guidance says that an AR should include "substantive information that was presented to, relied on, or reasonably available to the decision-maker."  OFFICE OF THE SOLICITOR, U.S. DEPARTMENT OF INTERIOR, STANDARDIZED GUIDANCE ON COMPILING A DECISION FILE AND AN ADMINISTRATIVE RECORD 2 (2006) [hereinafter DOI GUIDANCE].

The DOJ suggests that an agency appoint a single person to compile the administrative record.  DOJ GUIDANCE, at 2.  The designee should (1) contact all agency personnel, including those in field offices, who were involved in the final decision and ask them to search their personal files, (2) search archives for files of former employees who were involved in decision-making process, (3) search any agency files relating to the final agency action, (4) contact other agencies involved in the decision-making process to obtain relevant documents, and (5) search public docket room for documents previously released to the public.  Id. at 2-3.  The Department of Interior also recommends that an agency designate an employee to maintain a contemporaneous Decision File throughout the decision-making process which can serve as the basis of an AR if an agency decision is challenged.  DOI GUIDANCE, at 3.  It also suggests that the designee maintain a written record describing the locations searched and the persons consulted during compilation of the administrative record.  Id.

The DOJ suggests that an agency include "all documents and materials which were before or available to the decision-making office at the time the decision was

made," even if they were not specifically considered by the final agency decisionmaker. DOJ GUIDANCE, at 2. The Department of Interior suggests that an agency include documents that were reviewed by the decision-maker or considered by staff involved in the decision-making process. DOI GUIDANCE, at 5. Materials should be included regardless of whether they support the agency's final decision. DOJ GUIDANCE, at 2. While the DOJ refers to "documents and materials" it states that the AR should include all means of communication including paper, emails, computer tapes and discs, microfilm, microfiche, data files, graphs, charts, and handwritten notes. Id. at 3. When describing the types of documents that should be included, it lists (1) policies, guidelines, directives, and manuals; (2) articles and books; (3) factual information and data; (4) communications received from other agencies and the public; (5) draft documents;[2] (6) technical documents; (7) decision documents; (8) minutes and/or transcripts of meetings; and (9) memorializations of telephone conversations and meetings, unless they are merely personal notes. Id. at 3-4. In addition to this list, the Department of Interior includes documents cited as a reference in primary documents such as an EIS and internal "memoranda to the file." DOI GUIDANCE, at 7.

The Department of Interior directs the agency to exclude the following documents from the administrative record: (1) documents that are not relevant to the decision-making process; (2) documents that were not in the agency's possession when the final decision was made; (3) electronic communication that does not contain factual

---

[2] Draft documents should only be included if they were circulated outside of the agency or the author's immediate office and if the changes reflect significant input into the decision-making process.

8

information, substantive analysis, or documentation of the decision-making process; (4) personal notes and memorializations maintained for personal use and not shared with others. Id. at 8. The DOJ guidance largely agrees with these exclusions. In addition, an agency can exclude protected and privileged information, but should provide an index indicating that such information has been excluded. Id. at 12-13.

In sum, the guidance documents encourage an expansive interpretation of the phrase "all documents and materials directly or indirectly considered by the agency." Documents should be included in the record if they were considered by an agency staff member who advised the final decision maker. Documents should also be included if they were available to a final decision-maker, yet were not considered. See Motor Vehicles Manufacturing Association, 463 U.S. at 43 (stating that an agency decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"). The only documents that should be excluded from the record are those that are irrelevant to the challenged decision, those which were not in the agency's possession at the time the decision was made, personal notes, and privileged information. Given the complexity of NEPA cases and the expansive records that are generally produced, complete compliance with these guidance documents is virtually impossible. However, careful analysis of an agency's protocol for compiling a record may be helpful in determining whether whole classes of documents were incorrectly excluded from the record.

### IV. Procedure for Issuing a Record of Decision under the NEPA

What follows is the Court's understanding of the protocol for completing an environmental impact statement and issuing a record of decision pursuant to the NEPA.

## A. Summary of the NEPA

In enacting the NEPA, Congress "declare[d] that it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfil the social, economic, and other requirements of the present and future generations of Americans." 42 U.S.C. § 4331. Before an agency can take any action, it must first comply with the NEPA. "The primary purpose of [the NEPA] is to force agencies to take environmental factors into consideration when making significant decisions." ROGER W. FINDLEY & DANIEL A. FARBER, ENVIRONMENTAL LAW IN A NUTSHELL 28 (7th ed. 2008). The NEPA provides a variety of procedural steps that must precede agency action, depending on the severity of action's potential environmental impacts. An Environmental Impact Statement (EIS) is required for all actions which are (1) federal, (2) major, and (3) have a significant environmental impact. Id. at 29. When, based on an agency's past experience, a project will not have a significant environmental impact, the agency can apply a categorical exclusion and proceed without specifically evaluating a project's environmental impacts. See 23 C.F.R. § 771.117(a); 40 C.F.R. § 1508.4. If an agency is unsure whether a proposed action will have a significant environmental impact, it can first conduct an abbreviated Environmental Assessment (EA) to determine the scope of any environmental impact. See 40 C.F.R. §§ 1501.4, 1508.9. If an EA results in a Finding of No Significant Impact (FONSI), the project may proceed. However, if a project will result in significant environmental impacts, an EIS is required. Once an EIS has been completed, the agency must publish a Record of Decision (ROD) which explains the basis for its decision. The following sections

describe the procedural requirements of the EIS and ROD in more detail.[3]

## B. Environmental Impact Statements

### 1. Content Requirements

"The primary purpose of an [EIS] is to serve as an action-forcing device to insure that the policies and goals defined in the [NEPA] are infused into the ongoing programs and actions of the Federal Government. 40 C.F.R. § 1502.1. An EIS must contain the following sections:

<u>Purpose and Need for Action</u> – 40 C.F.R. § 1502.13. This section explains the underlying purpose and need to which the agency is responding. Id. "This discussion should clearly describe the problems which the proposed action is to correct" and "should clearly demonstrate that a 'need' exists." FEDERAL HIGHWAY ADMINISTRATION, U.S. DEPARTMENT OF TRANSPORTATION, NEPA IMPLEMENTATION: GUIDANCE FOR PREPARING AND PROCESSING ENVIRONMENTAL AND SECTION 4(F) DOCUMENTS 11 (1987), <u>available at</u> http://environment.fhwa.dot.gov/projdev.impTA6640.asp [hereinafter FHWA TECHNICAL ADVISORY]. Because the Purpose and Need for Action describes the problems which the proposed action seeks to correct, it also provides the benchmark against which to measure proposed alternatives.

<u>Alternatives</u> – 40 C.F.R. § 1502.14; 23 C.F.R. 771.123(c). "This section is the heart of the [EIS]" and "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear

---

[3]In this case, the FHWA acknowledged from the outset that the project would have a significant environmental impact and proceeded immediately with the EIS process. As a result, there is no need to discuss the CE and EA process in detail.

basis for choice among the options by the decision-maker and the public." 40 C.F.R. §1502.14.  This section must describe all "reasonable" alternatives and briefly explain why other "unreasonable" alternatives were eliminated.  Id.  Among the reasonable alternatives, the agency must include a "no-action" alternative as well as alternatives that may fall outside the agency's jurisdiction.  Id.  The agency must also include appropriate mitigation measures that may reduce potential environmental impacts. Id.  This section must provide sufficient detail for each alternative so that "reviewers may evaluate their comparative merits."  Id.

In the context of FHWA decision-making, the following alternatives should be considered: (1) a "no-action" alternative which consists of "short-term minor restoration . . . that maintain[s] continuing operation of the existing roadway," (2) a "Transportation System Management" alternative that includes "activities which maximize the efficiency of the present system," and (3) build alternatives which consist of both improvement of existing [roadways] and alternatives on new locations."  FHWA TECHNICAL ADVISORY, at 13.

Affected Environment – 40 C.F.R. § 1502.15.  This section "shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration." Id.  When possible, it should include a single description applicable to all of the alternatives rather than a separate description for each one.  FHWA TECHNICAL ADVISORY, at 14.

Environmental Consequences – 40 C.F.R. § 1502.16.  This section "includes the probable beneficial and adverse social, economic, and environmental effects of alternatives under consideration and describes the measures proposed to mitigate

12

adverse impacts." FHWA TECHNICAL ADVISORY, at 15. It forms the "scientific and analytic basis" for comparing alternatives. 40 C.F.R. § 1512.16. It must include (1) the environmental impacts of the alternatives, (2) any adverse impacts which cannot be avoided if an alternative is implemented, (3) the relationship between short-term and long-term interests, and (4) any irreversible or irretrievable commitments of resources which would be involved in implementing an alternative. Id. The agency must consider direct impacts, indirect impacts, potential conflict with other government policies and objectives, energy requirements, use of natural and depletable resources, urban quality, and historic and cultural resources. Id. The FHWA Technical Advisory lists 25 specific factors which should be addressed. See FHWA TECHNICAL ADVISORY, at 16-30.

### 2. Procedural Requirements

The content described above must first be compiled in a DEIS. After publication of the DEIS, the agency must provide for a comment period of at least 45 days. 40 C.F.R. § 1502.9, 10. The agency must obtain comments from any federal agency with jurisdiction by law or special expertise with respect to the project's environmental impacts. 40 C.F.R. § 1503.1(a)(1). It must also request comments from state and local agencies with authority to develop and enforce environmental standards, Indian tribes who may be effected, and any agency that has requested a copy of the EIS. Id. § 1503.1(a)(2). Finally, the agency must request comments from the applicant, if any, and from the public. Id. § 1503.1(a)(3), (4). It must affirmatively solicit comments from persons or organizations who may be interested or affected. Id. § 1503.1(4).

Before publishing an FEIS, the agency must respond to the comments received and adjust the EIS accordingly. It may modify an alternative, develop a new alternative,

13

supplement or modify its analysis, make factual corrections, or explain why a comment does not warrant further agency response. Id. § 1503.4. Only after responding to the comments may an agency publish a FEIS.

### C. Record of Decision

Once an agency has published a FEIS and reached a final decision it must issue a public Record of Decision (ROD). 40 C.F.R. § 1505.2. The ROD must:

> (a) State what the decision was.
> (b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.
> (c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

Id. While the CFR provides considerable detail about the content of the ROD, it provides no guidance as to the substantive decision that is made. In other words, the ROD, like all NEPA requirements, must disclose the agency's decision-making process, but does not constrain the agency's actual decision.

### V. Protocol for Section 4(f) Evaluation

What follows is the Court's understanding of the protocol for complying with the requirements of Section 4(f) when an EIS is required under the NEPA.

When a proposed agency action subject to the NEPA also involves the use of

14

land protected by Section 4(f), an additional evaluation must be conducted.  Section 4(f) property is defined as "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance."  49 U.S.C. § 303; 23 C.F.R. § 774.17.  A proposal which would negatively impact Section 4(f) property can only be approved if there is "no feasible and prudent avoidance alternative" and the proposal includes "all possible planning . . . to minimize harm to the property resulting from such use."  Id. § 774.3(a). When an agency is required to prepare an EIS, the Section 4(f) evaluation can be included as a part of that document.

A Section 4(f) evaluation must include the following sections:

<u>Proposed Action</u> - a section that describes the proposed project and explains its purpose and need.

<u>Section 4(f) Property</u> - a section that describes each Section 4(f) resource that would be used in any alternative discussed in the EIS.

<u>Impacts</u> - a section that describes the impact on Section 4(f) property for each alternative.  It should include quantitative data where available and qualitative descriptions in other cases.

<u>Avoidance Alternatives</u> - a section that identifies and evaluates location and design alternatives that would avoid impacting Section 4(f) property.

<u>Measures to Minimize Harm</u> - a section that discusses all possible measures which could minimize the harm to Section 4(f) property in the event that an alternative impacting such property is selected.

FHWA TECHNICAL ADVISORY, at 38. When the evaluation is combined with an EIS, this

15

evaluation should be included as a separate section of the DEIS.

If a preferred alternative identified in an FEIS and Section 4(f) evaluation includes the use of Section 4(f) property, the FEIS must contain a detailed explanation of why that alternative was chosen. It must include a discussion of the basis for concluding that there is no feasible and prudent alternative to the use of Section 4(f) land. Id. at 39. This is a high burden and the supporting information must establish that "there are unique problems or unusual factors involved in the use of alternatives that avoid [Section 4(f)] properties or that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes." Id. It must also discuss the basis for concluding that the proposed action includes all possible planning to minimize harm to the Section 4(f) property. Id.

## VI. Analysis

### A. Plaintiffs' Position

Plaintiffs' Motion for Leave to Take Discovery asserts that the certified AR filed by the FHWA is not the complete AR. It seeks the inclusion of (1) 225 documents identified through FOIA requests, (2) emails relating to or referring to the DRIC or Bi-National Border Partnership dated between January 1, 1998 and January 4, 2009, (3) all emails identified using the search terms specified in Doc. 16, Ex. 10, (4) all policies, guidelines, directive, and manuals relevant to consideration of the DRIC or the decision to issue the ROD, and (5) all memorializations of telephone conversations and meetings relating or referring to the DRIC or the Bi-National Border Partnership.

### B. Defendants' Position

The FHWA asserts that the certified AR "contains the grounds for FHWA's decision and the universe of materials that informed the agency's decision."

### C. The Court's View

Based on the information provided by the FHWA, the Court is not in a position to make a determination regarding the completeness of the AR. The certification of the AR states in whole (Doc. 14):

> I, Theodore G. Burch, Assistant Division Administrator for the Federal Highway Administration, Lansing, Michigan, certify that the attached documents were taken from the files and electronic records of the Federal Highway Administration and from the files and electronic records of the Michigan Department of Transportation. Accordingly, these documents comprise the complete Administrative Record for the highway project knows [sic] as the Detroit International River Crossing Project, which is at issue in this case.

While perhaps adequate as a certification, this statement, in the Court's view, provides no guidance as to the process by which the AR was compiled. The FHWA's response to plaintiffs' motion, (Doc. 18), provides no additional information. Until the FHWA describes the process by which the AR was compiled the Court is not in a position to assess whether the process was sufficient and whether the FHWA is entitled to a presumption of regularity.

Further, the current state of the AR renders it virtually impenetrable. The Court's ultimate task in this case is to determine whether the FHWA's ROD should be set aside as an arbitrary and capricious decision. To do so, the Court must determine whether the FHWA complied with the procedures set forth in the NEPA and Section 4(f) by engaging in a "thorough, probing, in depth" review of the AR. The FHWA has provided

17

an index en mass to the AR comprising three volumes and 435 pages. There is no discernable organizational structure as to the dates, types of documents, or subject matter of the materials included in the AR. Further, there is nothing in the indices to indicate the DVD on which a given document is located. The Court is not in a position to engage in a "thorough, probing, in-depth review" of the AR if it cannot effectively identify and locate relevant documents within the record.

## VII. Conclusion

As described above, the Court is not in a position to render a decision on the Motion for Leave to Take Discovery given the current state of the AR. Accordingly plaintiffs' motion is STAYED pending the FHWA's production of the following, which the Court believes will better enable it to adequately assess the completeness of the AR:

(1) A description of the process by which the AR was compiled, including (a) the search terms for any electronic search, (b) any date restrictions for electronic or physical searches, and (c) any categorical content exclusions.

(2) An index of the AR organized as to the principle categories set forth in the Table of Contents of the ROD. These categories are identified with an asterisk (*) in Exhibit 1.

(3) A separate index for each DVD comprising the AR. The FHWA must provide a hard copy of the indices as well as a searchable electronic index that identifies the DVD on which each document is found.

The FHWA shall file these documents no later than September 16, 2010.

This Memorandum and Order does not alter the briefing schedule for the FHWA's motion to affirm as set forth on the record on August 4, 2010.

SO ORDERED.

Dated: August 18, 2010                     S/Avern Cohn
                                           AVERN COHN
                                           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 18, 2010, by electronic and/or ordinary mail.

                                           S/Julie Owens
                                           Case Manager, (313) 234-5160