UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LATIN AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT, CITIZENS
WITH CHALLENGES, DETROIT ASSOCIATION
OF BLACK ORGANIZATIONS, DETROITERS
FOR PROGRESS, MANA DE METRO DETROIT,
MEXICAN PATRIOTIC COMMITTEE OF METRO
DETROIT, DETROIT INTERNATIONAL BRIDGE
COMPANY,

       Plaintiffs,

                                               Case No. 10-10082
-vs-                                   HON. AVERN COHN

The ADMINISTRATOR of the Federal Highway
Administration, in his official capacity, THE FEDERAL
HIGHWAY ADMINISTRATION, JAMES J. STEELE,
in his official capacity as the Michigan Division
Administrator of the Federal Highway Administration,
an individual,

       Defendants.
_____/


**DECISION AND ORDER
GRANTING DEFENDANTS' MOTION TO AFFIRM (Doc. 68)**

**TABLE OF CONTENTS**

I.      Introduction                                                                          1

II.     Background                                                                          3
        A.      General Background                                                    3
        B.      The Parties and Overall Positions                               4
        C.      The DRIC Planning Process                                         5
        D.      The Draft Environmental Impact Statement (DEIS)       11
        E.      The Final Environmental Impact Statement (FEIS)        12
        F.      The Record of Decision (ROD)                                     13

III.    Procedural History/Complication of the AR                              13

IV.     The Motion Papers                                                               14

V.      Legal Standards                                                                    15
        A.      APA                                                                              15
        B.      Federal Statutes                                                         16

VI.     The Bridge Company's Standing                                            18

VII.    Discussion                                                                           20
        A.      The Bridge's Company's Arguments                              20
                1.      Selection of the Preferred Alternative                   20
                        a.      Consideration of Alternatives                      20
                        b.      Canadian Review Process              24
                        c.      Rejection of No Build Alternative                 25
                        d.      Rejection of the Second Span as Encroaching on the
                                Bridge Company's Franchise Rights              27

                2.      Purpose and Need                                               28
                        a.      The FHWA's Traffic Methodology      29
                        b.      Investment Grade Traffic Forecast              31
                        c.      Customs Processing                                   32
                        d.      Redundancy                                             32

i

|       |       | 3.    | Procedural Arguments                               | 35 |
|       |       | 4.    | Conclusion on the Bridge Company's Arguments       | 36 |
|       | B.    | LASED and Other Organizational Plaintiffs' Arguments | 37 |
|       |       | 1.    | The Right to Judicial Review                       | 37 |
|       |       | 2.    | Environmental Justice                              | 38 |
|       |       | 3.    | Procedural Completeness                            | 38 |
|       |       | 4.    | Conclusion on LASED's Arguments                    | 42 |
|       | C.    | Amicus' Arguments                                  | 42 |
| VIII. | Conclusion |                                          | 45 |

## ATTACHMENTS

APPENDIX - List of Acronyms

EXHIBIT 1 - Reports and Studies Underlying the DRIC record

EXHIBIT 2 - Aerial Photograph

# I.  Introduction

This is case under the Administrative Procedure Act (APA),[1] 5 U.S.C. § 702, involving a challenge to the Federal Highway Administration's (FHWA) January 4, 2009, Record of Decision (ROD) which selected as the "environmentally approved alternative" a new international bridge crossing between the United States and Canada in the Delray[2] neighborhood in Detroit, Michigan (the DRIC project).[3]  Plaintiffs include a number of community organizations with ties to the Delray neighborhood as well as the operators of the Ambassador Bridge, an international bridge crossing located approximately two miles from the proposed crossing.  Plaintiffs contend that defendants – the Administrator of the Federal Highway Administration,[4] James Steele, in his official capacity as the the Michigan Division Administrator of the FHWA, and the FHWA – failed to comply with the requirements of the National Environmental Protection Act (NEPA), Section 4(f) of the Department of Transportation Act, and Section 106 of the National Historic Preservation Act (NHPA) when they issued the ROD.  Simply stated, it is plaintiffs' contention that the NEPA process was pretextual and resulted in a decision that was arbitrary and capricious act.

---

[1]A list of acronyms used in this decision appears in the attached appendix.

[2]Delray is a neighborhood and former incorporated village, located on the south side of Detroit, Michigan.  In general terms, it extends south to the River Rouge, east to the Detroit River, west to Fort Street and Interstate 75, and north to Dragoon Street at Fort Wayne or to Clark Street.  See http://en.wikipedia.org/wiki/Delray,_Detroit (last visited Apr. 4, 2012)

[3]For additional background, see Memorandum and Order Staying Plaintiffs' Motion for Leave to Take Discovery (Doc. 30), reported at 2010 WL 3259866 (E.D. Mich. Aug. 18, 2010).
.

[4]The Administrator is not named in the complaint.

While the process is further explained below, attached as Exhibit 1 is an exhibit prepared by the FHWA (Doc. 68-2) entitled Reports and Studies Underlying the DRIC record which captures the depth and breadth of the NEPA process in a nutshell.  This documents lists 103 reports and studies on varied relevant topics which comprise the heart of the NEPA process.  These documents include, but are not limited to, the illustrative alternatives, need and feasibility analysis, traffic analysis, air quality analysis, cultural analysis and archeological resources, engineering analysis, and impacts analysis.  This exhaustive process lead to the selection of the preferred location for the United States side of a new crossing in Delray.  It was a reasoned process and a reasoned decision.

To further orient the reader, attached as Exhibit 2 is an aerial photograph of the area studied during the DRIC process, with the location of the new bridge indicated. The FHWA submitted it following the Court's request at the hearing on its motion to affirm (Doc. 110-2).  The photograph is not a part of the administrative record and is used for illustrative purposes only.

This decision affects only the NEPA process, which is just one of the steps required before construction of a new bridge takes place as envisioned by the DRIC project.

That being said, now before the Court is the FHWA' Motion to Affirm the Decision of the Michigan Division Administrator of the Federal Highway Administration (Doc. 68). For the reasons that follow, the motion will be granted.

## II.  Background

### A.  General Background

As will be explained in more detail below, the DRIC planning process officially began in 2001 when representatives from the Michigan Division of the FHWA, the Michigan Department of Transportation (MDOT), Transport Canada, and the Ontario Ministry of Transportation (collectively "the agencies") met to discuss border transportation needs.  The agencies commissioned a planning study ("Planning Needs and Feasibility Study") which was completed in January 2004.  The Planning Needs and Feasibility Study concluded that additional capacity was needed for the border crossing between Detroit, Michigan and Windsor, Ontario.  According to the FHWA, the purpose and need for the new project was to "provide safe, efficient and secure movement of people and goods across the U.S.–Canadian border and to support the economies of Michigan, Ontario, Canada, and the United States."

The agencies considered several bridge, customs plaza, and associated highway connection proposals as well as the environmental effects that would result from each alternative.  In March 2003 the FHWA published a Notice of Intent to prepare an Environmental Impact Statement (EIS).  A Draft Environmental Impact Statement (DEIS) was published in February 2008.  After the public was given an opportunity to comment on the DEIS, a Final Environmental Impact Statement (FEIS) was published on November 21, 2008.  On January 4, 2009 the FHWA published the ROD approving a proposed bridge crossing, customs plaza, and highway connection in the Delray neighborhood in Detroit, Michigan.  The DEIS, the FEIS, and the ROD contain the sum and substance of the FHWA's decision and are the focus of the Court's review of the

3

administrative record.[5]

## B.  The Parties and Overall Positions

In 2010, seven plaintiffs filed suit against the FHWA challenging the ROD.

Plaintiff Detroit International Bridge Company (Bridge Company), a Michigan

corporation with its principal place of business in Warren, Michigan, owns and operates

the Ambassador Bridge.  Plaintiff Latin Americans for Social and Economic

Development (LASED) is a non-profit organization in Southwest Detroit.  Plaintiff

Citizens with Challenges is a non-profit organization whose director is a lifelong resident

of Delray.  Plaintiff Detroit Association of Black Organizations is a federation of over 130

black and non-black organizations. Plaintiff Detroiters for Progress is an organization

run by Adolph Mongo.  Plaintiff MANA de Metro de Detroit is a local chapter of MANA, a

national Latina organization.  Plaintiff Mexican Patriotic Committee of Metro Detroit is a

volunteer organization with ties to Southwest Detroit.

As noted above, plaintiffs sued three federal defendants: the Federal Highway

Administration, the Administrator of the FHWA, and James J. Steele, the former

Michigan Division Administrator of the FHWA.  Steele signed the ROD on behalf of the

FHWA.

At bottom, the Bridge Company's position is that the DRIC environmental review

---

[5]The administrative record (AR), putting it mildly, is voluminous.  As noted supra, it consists of approximately 130,000 pages of documents.  While compilation of the AR proved to be a daunting challenge, see Part III, infra, it has been finalized and completed to the Court's satisfaction.  At the Court's request, the FHWA furnished an external hard drive containing the AR in an electronic form with a searchable index.  Citation to the AR, other than ROD and associated environment reports (the DEIS and FEIS) will be by the bates number, DRIC, followed by the page in the AR.

4

process was fatally flawed because it eliminated an alternative proposed second span of the Ambassador Bridge too early in the process.  The Bridge Company also says that the agency failed to give a no build alternative, where no federal funds would be used but rather would be a privately funded endeavor, sufficient consideration.

The position of LASED and the other organizational plaintiffs is essentially that the DRIC study process was flawed in that the selection of Delray did not properly account for environmental justice because Delay is an economically depressed and minority community.  LASED in particular says that the agency should have selected a "downriver" location for the new crossing.

Amicus Dietrich Bergman[6] says that the DRIC study process failed to sufficiently consider non-highway alternatives.  Amicus argues that the agency should have pursued intermodal rail options instead of building another bridge.

The FHWA says that none of the plaintiffs take issue with the agency's finding that there is a need for increased mobility and capacity for the flow of traffic and good from the United States and Canada in the DRIC study area.  Rather, the FHWA says that the parties simply disagree on how best to accomplish these ends.  The FHWA further says that a disagreement as to the ultimate decision, i.e. selection of the location of a proposed new bridge, does not render the decision arbitrary or capricious.

### C.  The DRIC Planning Process

In 2001, representatives of the Michigan Division of the FHWA, MDOT, and two Canadian governmental entities met to discuss border transportation needs.  ROD at 1.

---

[6]The Court granted the motion of Dietrich Bergman for leave to file an amicus brief (Doc. 77).

A partnership between FHWA, MDOT, Transport Canada, and the Ontario Ministry of Transportation was formed to consider a new crossing. The purpose and need for a new border crossing was to "provide safe, efficient and secure movement of people and goods across the U.S.-Canadian border and to support the economies of Michigan, Ontario, Canada, and the United States" and to support homeland security for a period of thirty (30) years." ROD at 9.

The United States and Canada have the largest bilateral trading partnership in the world. FEIS 5-3. The United States is Canada's largest export market and the United States International Trade Administration identified Canada as the largest export market for 38 of the 50 states. Seventy percent of the U.S-Canada trade moves by truck. FEIS 5-4. In December 2001, the United States and Canada signed a "Smart Border Declaration," which was accompanied by a 30-point action plan that placed emphasis on border security and infrastructure. Id. Over the past 30 years, bilateral trade in goods and services has grown faster than the gross domestic product. FEIS 5-5.

The current bridge, the Ambassador Bridge, is more than 80 years old. The Ambassador Bridge is two lanes in each direction. Id. Huron Church Road is the access road to the Ambassador Bridge in Canada and connects the bridge to Highway 401, which is a limited-access highway similar to a U.S. Interstate Highway. There are approximately 17 signalized intersections on Huron Church Road between the Ambassador Bridge and Highway 401. Many of these signalized intersections are approaching capacity, with several movements already at or near critical levels. Id.

The DRIC project sought to address mobility requirements across the

6

U.S.-Canada border in order to (1) provide new border crossing capacity to meet long-term demand; (2) improve system connectivity; (3) improve operations and processing capability; (4) and provide reasonable and secure crossing options in the event of maintenance, congestion or other disruptions.  With these goals in mind, the partnership between the U.S. and Canada determined that an "end-to-end" — a connection from the proposed crossing to a major highway — solution should be evaluated.  ROD at 9.

In March 2003, the FHWA published a Notice of Intent to prepare an Environmental Impact Statement.  Id.  The DRIC planning process first explored in detail several potential corridors for a border crossing site, as part of the preparation of the Planning Needs and Feasibility Study in 2004.  FEIS 2-1.  The Planning Needs and Feasibility Study found the need for additional transportation capacity in the Detroit-Windsor corridor.  FEIS ES-4.  That study further identified five corridors in the Detroit-Windsor area that could host a new border crossing.  FEIS 2-1; FEIS ES-7.

The partnered governments then began to consider several bridge proposals and the environmental effects their associated roadway connections would have on various sites in Eastern Michigan.  They adopted a common set of evaluation criteria for both sides of the border:

(1) protect neighborhood characteristics;

(2) maintain consistency with local planning;

(3) protect cultural resources;

(4) protect the natural environment;

(5) improve regional mobility;

7

(6) maintain air quality; and

(7) constructability.

Several federal agencies joined the FHWA as cooperating agencies that commented and participated in the DRIC analysis process, including: U.S. Army Corps of Engineers; U.S. Coast Guard; U.S. Environmental Protection Agency; U.S. Fish and Wildlife Service; U.S. General Services Administration; U.S. Department of Homeland Security and U.S. Department of State.  FEIS, ES-4.

In July 2005, the FHWA published a Scoping Report, which commenced the full environmental review for the DRIC.  The report identified three "broad areas" in which illustrative alternatives were being considered:  Downriver study area, Central study area, and Belle Isle study area.  The report explained that the "evaluation process begins with a determination by the Partnership Steering Committee, with input from the Working Group and Consultants, of only those options that will meet the project's purpose and need. These are then to be compared to the No Action. . . option." DRIC001220.  The Scoping Report stated that each alternative would be scored based on the seven evaluation criteria as well as on cost effectiveness, and then the alternatives would be examined according to how well each addresses the objective of providing mobility across the U.S.-Canada border consistent with the purpose and need so that the best "end-to-end proposals can be 'short listed' as Practical Alternatives." DRIC001232.

On August 31, 2005, the cooperating agencies and a larger group of agencies attended a kick-off scoping meeting in Detroit.  FEIS ES-4.  The DRIC analysis began with a list of 51 potential Illustrative Alternatives in the U.S., including combinations of

8

highway connectors, plazas and border crossing.  FEIS ES-7.  Several of the identified
alternatives had fatal flaws that removed them from consideration.  These included
reasons such as inability to tunnel, highly contaminated areas, or major industrial
operations, the latter meaning it was too costly to relocate those operations to make
way for a new crossing.  Id.

In November 2005, Steele, on behalf of the FHWA, publically announced that
twinning the Ambassador Bridge—the addition of a second span—was not a practical
alternative for further study on the U.S. side.  As reflected in the record, although the
twinning of the Ambassador Bridge had originally ranked high on the United States side,
it ranked very low on the Canadian side when scored against the agreed-upon criteria
between the United States and Canada.  FEIS 2-14-2-15.  The twinning option would
create significant community disruptions and environmental impacts both in the
development of an expanded plaza and the rebuilding of the roadway to make it a
freeway-to-freeway connection on the Canadian side.  Id.  Steele concurred with the
Canadian evaluation and agreed with the Canadian decision not to pursue further study
of this alternative.  Id.  Twinning of the Ambassador Bridge also failed to satisfy the full
complement of project needs for the United States, including redundancy and economic
security.

The DRIC team evaluated 15 crossing locations coupled with a variety of plaza
and connector corridors totaling approximately 37 "illustrative alternatives.  In November
2005 the majority of the "illustrative alternatives" were eliminated as not adequately
addressing the evaluation criteria.  The area between Zug Island and the Ambassador
Bridge was identified as the "area of continued analysis," as well as the No Build

Alternative.

In December 2005, the DRIC team concluded its analysis of "illustrative" alternatives.  At that time, the team selected the area where all of the "practical" alternatives would be located: between Zug Island and the Ambassador Bridge and between the Detroit River and I-75 with two potential river crossings.

The analysis of preliminary practical alternatives began in December 2005 and continued for almost two years, to July 2007.  FEIS ES-6.  Using the two possible river crossings, over a dozen different alternatives were developed through combinations of river crossings, plazas and interchanges with I-75.  Id.  As will be explained, the FHWA involved the public in the evaluation of these preliminary practical alternatives.  The General Services Administration (GSA), a division of the U.S. Department of Homeland Security and other cooperating agencies were also involved in the initial analysis of practical alternatives.  Id.  A series of workshops were held from December 2005 to March 2006 to determine, in concert with the public, the acceptable plaza locations within the two crossings.  Id.  The plazas and interchanges were developed to connect to I-75 and those alternatives, along with their impacts, were presented to the public in December 2006.

Further analysis of the alternatives revealed that several alternatives would have required the use of land from historic Fort Wayne.  Other alternatives were deemed impractical based on public, agency and engineering review.  These alternatives were subsequently rejected.  ROD 10; DEIS ES 4-6.

**D.  The Draft Environmental Impact Statement (DEIS)**

In February 2008, the FHWA published the DEIS.  The DEIS analyzed nine alternatives for the DRIC crossing, and a "No-Build alternative."  ROD at 11.  The no-build alternative did not include a new crossing built by the government.  Rather, it considered a proposal by the Bridge Company to build a six-lane span to replace the existing, four-lane Ambassador Bridge.  DEIS 2-36.  The nine alternatives for a brand new crossing site were all located in Southwest Detroit.  Federal, state, and local agencies and the public reviewed and commented on the DEIS.  ROD at 11.

From 2005 to 2008, in order to provide greater level of detail than could be provided in the DEIS or FEIS, the FHWA and MDOT produced a series of 13 technical reports plus accompanying volumes.  FEIS Forward.  The separate technical reports included:

a.  Illustrative Alternatives (discussion of early alternatives considered in the DRIC study);

b.  Traffic Analysis (four volumes of reports with the last volume added for the Preferred Alternative);

c. Induced Demand Analysis (discussion of the interrelationship of a new border crossing, land use and travel demand);

d.  Air Quality Analysis (analysis and discussion of the future air quality to meet the requirements of the Clean Air Act);

e. Noise Study (analysis and discussion of noise sensitive receivers and where noise walls are warranted);

f. Wetlands, Threatened and Endangered Species, and Coastal Zone Management
Study (analysis and discussion of impacts to the natural resources of the area);

g. Cultural Analysis/ Aboveground Resources (inventory, discussion of potentially historic or historic structures, districts and document impacts, mitigation and avoidance efforts);

11

h. Cultural Analysis/ Archeological Resources (inventory to determine whether any sites needed protection or further research);

I. Brine Well Cavity Investigation Program (analysis and discussion of program to ensure that previous salt mining created no voids that could affect the Project);

j. Initial Site Assessment/ Preliminary Site Investigation (determination of locations that might be contaminated and in need of remediation);

k. Conceptual engineering (documentation of all engineering conception of the proposed project);

l. Community Inventory (discussion of community characteristics); and

m. Indirect/ Cumulative Impacts Analysis (analysis of past, present, and reasonably foreseeable impacts from, and attributable to, the project).

## E.  The Final Environmental Impact Statement (FEIS)

On November 21, 2008, the FEIS was issued.  The FEIS identified a preferred crossing for the DRIC in Delray.  FEIS 3- 9.  This location would convert 160 acres of the community to transportation uses.  FEIS ES-30.

Approximately 1500 parcels of land in Delray are vacant.  Many of these parcels are owned by the City of Detroit due to the former owners' failure to pay taxes.  Many of the homes, some built over one hundred years ago, are in need of major repairs.  Id. Although the land use is predominately residential in Delray, the effects of industrial abandonment in Southwest Detroit are most noticeable in Delray.  In the 1930s, Delray was a thriving neighborhood of 21,000.  Today, it is home to approximately 4,200 people, comprised of approximately a third of either African-American, Hispanic or White individuals. The Hungarian community, which at one time was predominant, has been dwindling rapidly  over the last 30 years.

The FEIS concluded that the Delray site posed some potential adverse local

12

effects, as did every proposed alternative.  The impact on Delay included the relocation of 257 residences, 43 businesses and 9 non-profit entities.  However, the FEIS found that this location best met the purpose and need for the transportation improvements while preserving the historical, cultural, and natural resources of Delray.  FEIS 3-34-3-37.

Also of significance was The FEIS also concluded that without a new border crossing, Michigan could lose the opportunity to attract or retain 25,000 jobs.  FEIS-ES-28.

A Notice of Availability in connection with the FEIS was published in the Federal Register on December 8, 2008.  ROD at 29.  The wait period for comments closed on January 5, 2008.  Id.  Thirty-four comments were received.  Id.

### F.  The Record of Decision (ROD)

On January 4, 2009, the agency issued the ROD.  The ROD selected the Delray location as the project location, i.e. the Preferred Alternative.  In addition to the new border crossing, the project includes the creation of a plaza for tolls and customs inspections and an interchange connecting the plaza to I-75.  ROD at 3-4.  It is the basis for this final decision which the Bridge Company and the organizational plaintiffs challenge in this case.

### III.  Procedural History/Complication of the AR

On May 14, 2009 plaintiffs filed this action in the United States District Court for the District of Columbia (Case No. 09-00897).  On November 23, 2009 the FHWA lodged a certified AR with that court.  On November 25, 2009 plaintiffs filed a Motion for Discovery to Assure Completeness of the Administrative Record and a Motion for

13

Preliminary Injunction.  On November 25, 2009 the court granted the FHWA's Motion to Transfer Venue and the case was transferred to the Eastern District of Michigan. Plaintiffs' Motion for Reconsideration was denied.

At a February 19, 2010 status conference with the Court, the FHWA stated that it desired to supplement the AR.  A certified AR was filed on April 16, 2010 (Doc. 14). The FHWA filed errata sheets on April 22, 2010, (Doc. 15), and June 25, 2010 (Doc. 20) correcting errors in the certified AR.  It took some time to compile the administrative record in a manner making its components readily accessible and understandable.  See Notice by All Defendants Concerning Description of the Process by Which the Administrative Record was Compiled (Doc. 32); Defendants' Notice of Lodging Certified Administrative Record for the Detroit River International Crossing Project (Doc. 66); Defendants' Notice of Supplement to Lodging of Administrative Record [Filing of Affidavit], Dkt. #66 (Doc. 67); and Defendants' Notice of Supplement to Lodging of Administrative Record, Dkt. #66 (Doc. 90).  Plaintiffs, particularly the Bridge Company, further complicated the process by filing motions to take discovery, motions to supplement the AR and the strike the ROD, all of which were denied.  See Doc. 109. The AR is now final and complete.

### IV.  The Motion Papers

The pertinent motion papers consist of the following:

The FHWA's motion to affirm (Doc. 68)

Plaintiffs' responses (Docs 72, 73)

Amicus brief (Doc. 83)

The FHWA's reply (Doc. 85)

14

Plaintiffs' surreplies (Docs. 87, 88)

Plaintiffs' amended responses (Docs. 94, 95)

The FHWA's amended reply (Doc. 99)

Plaintiffs' amended surreplies (Docs. 101, 102)

In addition, the FHWA filed a statement of material facts not in dispute (Doc. 69), to which plaintiffs filed responses (Doc. 71, 75).

## V.  Legal Standards[7]

### A.  APA

The APA provides the authority for judicial review of agency decision under the NEPA.  See Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 778 (9th Cir. 2006). When an agency decision is challenged under the APA, a court must set it aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(b).  In so doing, a court should consider whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co. 463 U.S. 29, 43 (1983).  A reviewing court may not engage in de novo review of an issue before an agency, but must engage in a "thorough, probing, in-depth review" of the agency's decision.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

---

[7]For additional recitation of legal standards, including the Court's understanding of the requirements for NEPA review, the contents of the AR, and the ROD, see Doc. 30.

415 (1971).  Such review must be based on "the full administrative record before the [agency decisionmakers] at the time [they] made [their] decision" and cannot incorporate post hoc rationalizations.  Id. at 419-20.

It is not this Court's function to choose among competing proposals, methodologies, or expert opinions in evaluating the agency's compliance with federal law.  On these matters, the Court must defer to the "informed discretion" of deciding agencies.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989) (quoting Kleppe v. Sierra Club, 427 U.S. 390 (1976); Baltimore Gas & Electric Co. v. Natural Resources Defense Council, 462 U.S. 87, 103 (1983)).  The Court's inquiry is to determine whether the administrative record reveals a rational basis for the agency's decisions.  Manufactured Hous. Inst. v. U.S. E.P.A., 467 F.3d 391, 398-99 (4th Cir. 2006).

## B.  Federal Statutes

Congress enacted NEPA to establish a consistent process through which federal agencies must consider the consequences of their actions on the environment.  See 42 U.S.C. §§ 4321-4370f.  NEPA requires analysis and public disclosure of significant environmental effects in order to ensure informed public decision making but does not require that agencies select any particular decision.  Robertson v. Methow Valley Citizens' Council, 490 U.S. 332, 350 (1989).  NEPA prescribes the procedures by which agencies must consider the environmental impacts of their actions but it does not dictate substantive results.  Marsh v. ONRC, 490 U.S. 360, 371 (1989); City of Riverview v. Surface Transp. Bd., 398 F.3d 434, 442 (6th Cir. 2005).  Although NEPA requires courts to ascertain that the agency took a "hard look" at a project's

16

environmental impacts, <u>Marsh</u>, 490 U.S. at 350, the court's role "in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one."  <u>Vt. Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 555 (1978); <u>see also Sierra Club v. Slater</u>, 120 F.3d 623, 633 (6th Cir. 1997); <u>Mason County Med. Ass'n v. Knebel</u>, 563 F.2d 256, 264-65 (6th Cir. 1977).

Section 4(f) of the Department of Transportation Act protects "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge, of national, State or local significance, or land of an historic site of national, State or local significance" by permitting the Secretary of Transportation to "approve a transportation program or project . . . requiring the use of" such land only if: "(1) there is no prudent and feasible alternative to using the land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c) (2007).  The Secretary has delegated the authority to grant § 4(f) approvals to the FHWA.  49 C.F.R. § 1.45(a)(4). If no feasible and prudent alternative is available, FHWA must find that the project plans minimize the harm to the protected 4(f) resources.  <u>Druid Hills Civic Ass'n v. Fed. Highway Admin.</u>, 772 F.2d 700, 716 (11th Cir. 1985).

The NHPA is designed to take into account the effect of a proposed "undertaking" on properties eligible for or listed on the National Register of Historic Places (National Register).  16 U.S.C. § 470f (Section 106); <u>Narragansett Indian Tribe v. Warwick Sewer Auth.</u>, 334 F.3d 161, 166 (1st Cir. 2003).  Similar to NEPA, the NHPA is a procedural statute.  <u>Nat'l Mining Ass'n v. Fowler</u>, 324 F.3d 752, 755 (D.C. Cir. 2003).  Rather than imposing a substantive mandate, the NHPA requires that federal

17

agencies make a reasonable and good faith effort to identify historic properties, engage

the State Historic Preservation Office determine whether they are eligible for listing on

the National Register, assess the effects of the undertaking on any eligible historic

properties, determine whether the effects will be adverse and mitigate adverse effects.

36 C.F.R. §§ 800.3, 800.4(b), 800.4(c), 800.5(c), 800.6, 800.8, 800.9(c), 800.16.[8]

## VI.  The Bridge Company's Standing

The FHWA's amended response contains for the first time an argument that the

Bridge Company lacks standing.  (Doc. 94).  To establish Article III standing, a plaintiff

must show that: (1) they have suffered an "injury in fact" that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is

fairly traceable to the defendant's challenged action; and (3) that it is likely, as opposed

to merely speculative, that a favorable judicial decision will prevent or redress the injury.

Summers v. Earth Island Inst., 555 U.S. 488, 129 S. Ct. 1142, 1149 (2009).  A plaintiff

who brings a claim under the APA for a violation of NEPA does not have prudential

standing to sue unless the interests he seeks to vindicate are within the "zone of

interests" protected by NEPA.  Valley Forge Christian College v. Ams. United for

Separation of Church & State, 454 U.S. 464, 474-75 (1982); Club Italia Soccer & Sports

Organization, Inc. v. Charter Tp. of Shelby, Mich., 470 F.3d 286, 291 (6th Cir. 2006)

---

[8]As the FHWA points out, plaintiffs did not address the FHWA's arguments that the ROD complies with Section 4(f) and the NHPA in their amended responses to the motion to affirm.  Rather, plaintiffs' arguments focus on NEPA requirements.  While plaintiffs have abandoned their positions on Section 4(f) and the NHPA, the Court adopts and incorporates the FHWA's arguments regarding Section 4(f) and the NHPA, finding that neither statute has been violated.  See Doc. 68, pp. 18-20.

FHWA argues that the Bridge Company lacks standing because it has not shown that its alleged injuries fall within the "zone of interests" Congress sought to protect in enacting NEPA.  Club Italia, 470 F.3d at 291.  FHWA says that the Bridge Company's arguments show that its injury is solely to its economic interests.  The Bridge Company says that it does have standing because its challenge is intertwined with economic and environmental interests.

Although adverse economic impact is usually sufficient to demonstrate injury for the purposes of Article III, courts consistently hold that economic injury alone is not within NEPA's zone of interests, no matter how artfully dressed in other clothing it may be.  ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n, 205 F.3d 403 (D.C. Cir. 2000) (holding that economic interest of a competitor did not satisfy prudential standing requirements); Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 715 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions.

Here, while the Bridge Company's interest in challenging the ROD has an undeniable economic component, the Court is satisfied that the Bridge Company has also alleged an environmental injury in terms of the alleged adverse affect on air quality and noise in the Delay area where the Bridge Company does business.  As such, the Court will not dismiss the Bridge Company for lack of standing.

## VII.  Discussion

### A.  The Bridge Company's Arguments

19

### 1.  Selection of the Preferred Alternative

The Bridge Company's principal challenge to the DRIC's NEPA process focuses on the FHWA's consideration of alternatives.  Its fundamental issue is with the agency's elimination of the Second Span (of the Ambassador Bridge) from consideration and its subsequent decision to eliminate the No Build Alternative.  The Bridge Company contends that the agency (1) failed to consider a reasonable range of alternatives; (2) failed to ensure the Canadian environmental review process was consistent with NEPA; (3) acted arbitrarily and capriciously in its evaluation of the No Build Alternative; and (4) illegally eliminated the Second Span as an alternative in light of the Bridge Company's franchise over the Detroit River.

As an initial matter, the task of determining what alternatives merit consideration is one for the agency in the first instance.  Vt. Yankee, 435 U.S. at 551.  Courts inquire only whether the level of consideration given to an alternative was an "abuse of discretion."  Kentucky ex rel., Beshear v. Alexander, 655 F.2d 714, 718 (6th Cir. 1981); Isle Royale Boaters Ass'n v. Norton, 154 F. Supp. 2d 1098, 1127 (W.D. Mich. 2001); 40 C.F.R. § 1502.14.

### a.  Consideration of Alternatives

Here, the FHWA considered a reasonable range of alternatives and did not act arbitrarily and capriciously when it considered, but rejected, other alternatives in favor of the Preferred Alternative.  As set forth in detail above, a comprehensive evaluation process guided the agency's consideration of alternatives.  In November 2005, the agency produced a technical report entitled Evaluation of Illustrative Alternatives on U.S. Side of the Border, Volume 1: Summary.  That summary was preceded by four

volumes of technical reports providing analysis on potential routes, plazas and crossings.  The FHWA identified 51 combinations of connectors, plazas and crossings that were potential illustrative alternatives, including four proposals by the private sector.[9]  FEIS 2-2.  After scoring each illustrative alternative on cost-effectiveness, the Preferred Alternative ranked number one and the expanded Ambassador Bridge ranked two respectively by both the citizens and technical team weights.  The report noted that "these indices are very much apart from the other alternatives" and they are "among the best performers for regional mobility."  However, for the Canadian side of the border, the report found that the Second Span of the Ambassador Bridge is not "considered a candidate for further study as maintaining the existing crossing and connections in the border transportation network" because it did not address redundancy needs and, regardless of the plaza site selected, it impacts on the Canadian side were too great due to the plaza requirements and connecting route.  Nonetheless, the FHWA considered the expanded Ambassador Bridge's U.S plaza and freeway connection as candidates for further analysis.

After alternatives with fatal flaws or other unique circumstances were eliminated, the agency evaluated 15 crossing locations coupled with a variety of plaza and connector corridors totaling approximately 37 "illustrative alternatives."  ROD-9.  In November 2005 the majority of the "illustrative alternatives" were eliminated as not adequately addressing the evaluation criteria, the Delray area was identified for further

---

[9]Those proposals were: the Detroit River Tunnel Partnership (DRTP) conversion of rail tunnels to truck use; the Ambassador Bridge's proposed replacement span; a proposal for a bridge between Zug Island and the Ambassador Bridge; and the Don Flynn downriver proposal.  FEIS 2-2.

21

evaluation.  Subsequently, a number of practical alternatives, as well as the No Build Alternative, were developed in cooperation with the community.  FEIS ES-6; FEIS 2-5.

On November 10, 2005, FHWA officially eliminated the Ambassador Bridge Second Span from further consideration as an alternative because it would have unacceptable impacts on the Canadian side and failed to satisfy the full complement of project needs on the U.S. side — efficiency via freeway-to-freeway access and redundancy.  FEIS 2-14-15.  To that end, it was "the Partnership's position from the outset of the study [ ] that no one country would bear the brunt of impacts for a crossing system. . . ."  The Preferred Alternative was identified in the FEIS. Its selection was the end result of an U.S.- Canadian collaboration.  FEIS ES-16.  All of this shows a reasoned deliberative process in selecting among several alternatives.

The Bridge Company takes issue with this finding, contending that the DRIC will have significant impacts on Delray in contrast to the Second Span, which is a "no impact" crossing.  The Bridge Company further says that the agency ignored the potential negative impacts from the DRIC.  The record belies this assertion.  See DRIC005527 (noting that "[t]he study process would not find a place for a crossing without impacts") (emphasis in original); see also DRIC124001 (noting that both the Second Span and the DRIC will involve public monies).  The FHWA compared the No Build Alternative to the Preferred Alternative in two dozen impact categories as part of its Protection, and other federal and state agencies.  FEIS ES-6; FEIS 2-5.  The FHWA found that Canada "correctly identified significant community disruption and environmental impacts" from twinning and it agreed with "the Canadian decision to not pursue further study of this alternative." DRIC067462.  For example, expanding the

22

plaza and construction of a new freeway in the Huron Church Road Corridor would entail disrupting international traffic in an important trade corridor and had high impacts to the historic Sandwich town community in Canada.  FEIS 2-14.

Simply put, both countries agreed to respect each other's environmental review processes and to select a Preferred Alternative that would not unduly burden one country.  The Bridge Company, however, argues that the there was no agreement in place between the countries but rather the parties pursued an "unwritten, possibly illegal 'gentleman's agreement.'"  Doc. 95 at 24.  The AR shows quite the opposite.  In 2001, the United States, Michigan, Canada and Ontario entered into a border partnership agreement, which although not a binding agreement, memorialized the consensus between the parties.  DRIC081521-81524; see also DRIC005909.  There is nothing in NEPA or the Bridge Company's arguments to suggest that principles of comity are inconsistent with NEPA.

The FHWA compared the Second Span to the Preferred Alternative in several categories, including the impact on Delray.  NEPA does not require selecting the least expensive or least damaging alternative, but only requires that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  Agencies need not consider every conceivable alternative.  See Beshear, 655 F.2d at 718.  Rather, only a "reasonable" range of alternatives has to be analyzed.  40 C.F.R. § 1502.14(a); see also Mason Cnty., 563 F.2d at 263-64; Save Our Cumberland Mountain v. Kempthorne, 453 F.3d 334, 347 (6th Cir. 2006).  If the agency has adequately identified and evaluated the adverse

23

environmental effects of the proposed action, "the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Robertson, 490 U.S. at 350

Feasible alternatives may be rejected "if they present 'unique problems' or cause extraordinary costs and community disruption." Busey, 956 F.2d at 627; see N. Ala. Env'l Ctr. v. Kempthorne, 457 F.3d 969, 978 (9th Cir. 2006) (Importantly, NEPA does not require consideration of alternatives that are "infeasible, ineffective, or inconsistent with the basic policy objectives" )(citations omitted); see also Vt. Yankee Nuclear Pow. Corp. v. NRDC, 435 U.S. 519, 551 (1978) (NEPA is bounded by a notion of feasibility).

Here, the ROD shows that the FHWA considered all of the alternative and the competing interests before determining that the Preferred Alternative was the best option in light of all the considerations. The Second Span option was rejected in light of objections from Canada, whose shores would also host the proposed twinning of the Ambassador Bridge. The Second Span also did not meet the need for system connectivity, redundancy, capacity, or economic security needs. The rejection of all other proposed alternatives, including in particular the Second Span, had a reasoned basis. That is what NEPA requires and that is what was done.

### b. Canadian Environmental Review Process

The Bridge Company also argues that it was arbitrary and capricious to select the Preferred Alternative because FHWA "abrogated its [ ] responsibility to Canada" and allowed Canada to ignore NEPA when it rejected the Second Span. Doc. 95 at 3, 38, 45. This lacks merit. The Bridge Company provides no authority for the notion that NEPA applies to the Canadian environmental review process. Rather, Canada

24

reviewed the DRIC under its own environmental review process pursuant to Canadian law.  Principles of comity dictate that this Court affords deference to that review process.  Universal Consol. Companies, Inc. v. Bank of China, 35 F.3d 243, 244 (6th Cir. 1994) ("American courts historically gave considerable deference to foreign sovereigns, not as a requirement of constitutional law but as an act of comity under customary international law.").  Canada made an independent determination under its environmental laws about the impacts of various alternatives on its side of the river. See DRIC038518-DRIC038539 (draft guidelines for the Canadian evaluation of the DRIC under the Canadian Environmental Assessment Act); DRIC043145.

Moreover, as noted at the hearing, even if the United States believed that a second span of the Ambassador Bridge was the best alternative, the fact that Canada believed it would have too great an adverse impact on its side of the crossing, that essentially had to end the matter.  Indeed, without Canada's agreement as to the location of a new crossing, no bridge can be built.

The Court will not use NEPA to second-guess the merits of Canada's determination that the proposed Second Span of the Ambassador Bridge was not acceptable.  To the extent the Bridge Company takes issue with the Canadian environmental review process, they must do so within the confines of Canada.

### c.  Rejection of the No Build Alternative

The Bridge Company also says that the FHWA did not seriously consider the No Build Alternative.  The Court disagrees.  In requiring consideration of a no-action alternative, the Council on Environmental Quality (CEQ) "intended that agencies compare the potential impacts of the proposed major federal action to the known

25

impacts of maintaining the status quo." Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024, 1040 (10th Cir. 2001); 46 Fed. Reg. 18,026, 18,027. The FHWA did exactly that. It defined the No Build Alternative as "the benchmark for comparison of the alternatives" including "maintenance of the existing facility and replacement of bridges as they deteriorate." DEIS) 1-5.

First, there is some confusion in the record regarding what is meant by the No Build Alternative. The No Build Alternative considered in the ROD was not, as the Bridge Company suggests, the four-lane Ambassador Bridge plus the proposed 6-lane Second Span. Rather, the No Build Alternative did not include a second crossing. ROD 11; FEIS, ES-6. FHWA considered a privately funded six-lane "Second Span" to replace the existing, four-lane bridge as a "variation of the No Build Alternative." It considered this variation in its analysis of cumulative impacts. FEIS, ES-6; FEIS 2-39); FEIS 3-216- 3-222) (considering cumulative effects —U.S. and Transboundary —of Build and No Build Alternative including mobility, economic impacts, air quality and cultural resources). As the DEIS, FEIS and ROD make clear, the agency relied on a definition of a "No Build Alternative" that would maintain the status quo. FHWA sensibly assumed as a variation of the No Build Alternative a six-lane "Second Span" to replace the existing, four-lane bridge. FEIS 1-14; FEIS, ES-6; FEIS 2-39). The FHWA also reasonably found that the Second Span alone would not provide sufficient crossing capacity in the long-term in this important trade corridor. DRIC116380. DRIC124002, DRIC124003.

The record also shows that the FHWA gave serious consideration to the No-Build Alternative, considering its relative impacts on the community (FEIS 3-21),

26

environmental justice populations (FEIS 3-31), jobs and the economy (FEIS 3-14).

48-49), land use (FEIS 3-52), traffic (FEIS 3-71, FEIS 3-81, FEIS 3-102), non-motorized

transportation and bus service (FEIS 3-109), air quality (FEIS 3-119, FEIS 3-129), noise

(FEIS 3-141), wetlands (FEIS 3-149), archeological resources (FEIS 3-153),

aboveground resources (FEIS 3-157), cultural resources (FEIS 3-160), parkland

impacts (FEIS 3-168), visual landscape (FEIS 3-177), lighting (FEIS 3-182),

contaminated properties (FEIS 3-185), safety and security (FEIS 3-231), soils and

geological resources (FEIS 3-238), permits (FEIS 3-242), energy (FEIS 3-244),

long-term productivity (FEIS 3-251), and the irretrievable commitment of resources (

FEIS 3-252).  The FHWA also considered the indirect impacts, cumulative impacts and

trans-boundary impacts from the No Build Alternative.  (FEIS 3-191; FEIS 3-221-223;

FEIS 3-229).  The FHWA's assessment of 24 different kinds of impacts in relation to the

No Build Alternative, in the Court's view, constitutes a "hard look" under NEPA.

### d.  Rejection of the Second Span as Encroaching on the Bridge Company's Franchise Rights

The Bridge Company's argument that FHWA's process was deficient because, in

eliminating the Second Span/twinning option, it did not consider (1) the "rights" the

Bridge Company received from Congress, or (2) a settlement agreement that the Bridge

Company had with Canada.  This argument is not well-taken.  Franchise rights have

nothing to do with the environment and nothing do with NEPA.  The Bridge Company

cites no authority to the contrary.  However, the FHWA considered the Bridge

Company's asserted franchise rights at the initial phases of the DRIC study process.

DRIC-SUPP003266.  The FHWA also took into account the Department of State's

determination that a Presidential Permit is not required for the Second Span.  In any event, the Bridge Company's argument is not a proper challenge to a NEPA determination.[10] Moreover, the Bridge Company's settlement agreement with Canada as to the ownership of the Canadian side of the Ambassador Bridge has no viable connection to the FHWA's NEPA study process.  The Bridge Company's challenge to the ROD on these grounds is not sustainable.

Overall, the Bridge Company's arguments that the NEPA process was flawed based on the selection of the Preferred Alternative fall short.  The ROD shows a careful and deliberative process in considering and selecting the Preferred Alternative for the DRIC project.

### 2.  Purpose and Need

The Bridge Company next attacks the Purpose and Need for the project on both substantive and procedural grounds, contending that:  (1) the FHWA's traffic methodology was flawed; (2) the agency failed to consider an investment grade traffic forecast; and (3) redundancy is not a supportable rationale for the Purpose and Need. Each argument is addressed in turn below.

### a.  The FHWA's Traffic Methodology

The Bridge Company says that the FHWA's traffic data is flawed, contending that if they used more current actual traffic volumes, there would be no grounds supporting

---

[10]The Bridge Company has sued Canada and the U.S. Coast Guard to enforce its alleged franchise in a separate lawsuit in the district of Columbia.  Detroit International Bridge Co. v. Canada, 10–cv-00476-RMC (D.D.C. 2010).

the Purpose and Need of the project.  This argument is not well taken.  First, the Bridge Company used the DRIC traffic forecasts to support its analysis advocating the construction of the Second Span.  The Bridge Company, however, now says these DRIC traffic forecasts, are "flawed" and "grossly exaggerated."  Doc. 95 at 5.

Second, the FHWA's technical methodologies, including its traffic projections, are entitled to substantial deference and are subject only to a reasonableness review. As the Second Circuit observed, the courts are "neither required, equipped or inclined to resolve fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that construction of the proposed expressway is the most viable solution to projected travel needs in the future." Citizens for Balanced Env't and Transp. v. Volpe, 650 F.2d 455, 462 (2d Cir. 1981).  A reviewing court thus "does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS."  Id. (quoting Suffolk v. Sec'y of Interior, 562 F.2d 1368, 1383 (2d Cir. 1977)).

Here, the FHWA produced four separate working papers to support its traffic models and considered over 24 reports on traffic models and projections.  See Doc. 68, Ex. 1 (chart listing all reports traffic-related reports and studies); and weighed the effects of the economic downturn and the declining automobile industry in its forecasts. DRIC004166-004168.  The AR also contains testimony from the Southeast Michigan Council of Governments, the Brookings Institute, Chrysler and Ford, among others, established a consensus that the DRIC traffic forecasts were reasonable.  DRIC005068.

Third, despite the Bridge Company's suggestion to the contrary, the "actual"

29

traffic volumes submitted by the Bridge Company were considered.  The FHWA,
however, deemed that data misleading because, among other things, they had an
earlier horizon year than the DRIC models, did not account for trucks' larger size, and
because the Ambassador Gateway Project was diverting traffic to other crossings.
DRIC070593-DRIC070602; DRIC005139;DRIC004165.  Based on its own modeling,
FHWA did not agree with the Bridge Company's assumption that traffic would be flat
over the next forty years.  See, e.g., DRIC005068;DRIC070593-070602;
DRIC016043-016044; DRIC124546; DRIC005139; DRIC123371; DRIC129992.
Moreover, the experts and stakeholders that the agency consulted agreed that the
the Bridge Company's "no growth" forecast was unreasonable.  DRIC005068.

The Bridge Company's argument that FHWA's traffic projections are "grossly
exaggerated" likewise ignores the long modeling process that accounted for a variety of
developments, including the recession and its impact on traffic, through its risk analysis.
DRIC110250; DRIC060992-060996; DRIC058458-058464; DRIC005137-005141;
DRIC082258-082260; DRIC109363-109369; DRIC059421; DRIC122760.  During the
traffic modeling process, MDOT analysts took a hard look at the initial traffic projection
data and expressed concerns that the traffic projections looked high for the DEIS when
compared to the projections considered for the Planning, Need and Feasibility report.
DRIC062081-062092.  Although the FHWA recognized that traffic modeling inevitably
"must start with a base year that is likely going to be several years old by the time the
environmental processes are completed," it found that no "freshening" was required
because no "circumstances have introduced changes that require a rethinking of the
basic assumptions that underlie the modeling process." DRIC060995; DRIC129273.

30

Although the 2008 traffic volumes were lower than anticipated due to a strike, the Gateway Project and the depressed economy, the 2007 traffic volumes were within low range of the DRIC forecast.  DRIC060994-DRIC060995.  Independent traffic forecasts also supported the DRIC models. DRIC057025; DRIC129273.

Based on the AR, the Bridge Company's challenge to the FHWA's traffic projections as arbitrary and capricious fails.  Not only did the Bridge Company rely upon the very same traffic forecasts to support a proposal for the Second Span, but the AR shows that the FHWA's traffic data resulted from a reasoned process.[11]

In the end, the Bridge Company may disagree with FHWA's traffic projections but it has not established that the FHWA's reliance on its traffic models to support the Purpose and Need of the DRIC was unreasonable.

### b.  Investment Grade Traffic Forecast

The Bridge Company also takes issue with the ROD because the FHWA did not include the investment grade traffic forecast in the AR.  While the FHWA did not rely on the investment grade forecast to support the project's Purpose and Need, the AR shows that Transport Canada commissioned the confidential investment grade traffic forecast to evaluate whether private investors would actually invest in the DRIC; that is, would the new crossing bring in sufficient toll revenues to make it attractive to the market.

---

[11]The Bridge Company sought to introduce an extra-record exhibit to challenge the FHWA's traffic projections.  In denying the Bridge Company's motion to supplement the AR, the Court deemed this exhibit inadmissible.  (Doc. 109).  Indeed, the Bridge Company's reliance on post-decisional traffic numbers that have been analyzed by an unnamed "in-house traffic expert" is not proper.  See Wisconsin Elec. Power Co. v. Costle, 715 F.2d 323, 327 (7th Cir. 1983) (post-decisional information may not be used to attack an agency's decision).

DRIC003818; DRIC124546; DRIC005068-5069.  This is a wholly different inquiry from whether capacity is needed in the first place or whether there are policy considerations supporting a second crossing.  The agency's decision not to consider the investment grade traffic forecast in the DRIC study process was not an abuse of discretion.

### c.  Customs Processing

The Bridge Company next argues that there is no need for the DRIC because customs processing, not capacity, is the core problem.  The FHWA says that this argument conflates immediate congestion issues with long-term capacity needs.  The Court agrees.  In support, the Bridge Company relies on the Taylor Report.  See Doc. 39.  The Taylor Report concluded that while present delays were a function of facilities and staffing "capacity will be available for several more years than originally envisioned [in the Canadian Consultant's URS Report], existing crossings will still reach capacity well within the 30 year window for the needs assessment on this Project."  Doc. 39, at 6.  Thus, the Taylor Report states that a new crossing is needed.  The Bridge Company's challenge to the Purpose and Need on this ground fails.

### d.  Redundancy

The Bridge Company next challenges the Purpose and Need of the project by arguing that redundancy is a false rationale and that the new crossing would not provide redundancy in any event.  These arguments do not carry the day.

Courts afford agencies considerable discretion to define the purpose and need of a project.  Alliance for Legal Action v. FAA, 69 Fed. Appx. 617, 622 (4th Cir. 2003); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991). A court evaluates a statement of purpose and need under a reasonableness standard.

32

E.g., Alliance for Legal Action, 69 Fed. Appx. at 622 ("we defer to the agency if the

statement is reasonable").

Here, the Purpose and Need statement is as follows:

The project purpose is, for the foreseeable future (I.E., at least 30 years from today), to:

- Provide safe, efficient and secure movement of people and goods across the U.S.-Canadian border in the Detroit River are ti support the economies of Michigan, Ontario, Canada, and the United States

- Support the mobility needs of national and civil defense to protect the homeland.

The project is needed to address future mobility requirements (i.e., at least 30 years) across the U.S.-Canadian border.  More specifically it is needed too:
- Provide new border-crossing capacity to meet increased long-term demand;
- Improve system connectivity to enhance the seamless flow of people and goods;
- Improve border operations and processing capability in accommodating the flow of people and goods; and
- Provide reasonable and secure crossing options in the event of incidents, maintenance, congestion, or other disruptions

ROD at 9.

Redundancy was one component of the larger Purpose and Need for the project.

To that end, in setting the Purpose and Need, the agency could reasonably conclude

that a new crossing would provide redundancy by providing a crossing option to

address any disruption at the Ambassador Bridge.  The term redundancy did not just

refer to a second bridge as the Bridge Company suggests, but rather also included

redundancy in plazas and approach roads.  DRIC005909; DRIC005543.  The proposed

Second Span would not provide redundancy because it would offer only one plaza and

one connection to the freeway. DRIC014344 (FEIS 1-14) (a "new crossing at a different

location with separate inspection plazas and new connections to the freeway network in

33

both countries together with the Ambassador Bridge crossing system would provide a second distinct crossing system and a greater degree of redundancy."); DRIC005913; DRIC005543; DRIC015909.23.[12]  The Department of Homeland Security agreed with this determination. DRIC015909; DRIC005913; DRIC005909; see also DRIC005543.

The Bridge Company relies on a State Department letter in which the Department noted that proximity of the proposed crossing to the Ambassador Bridge means that a significant disruption at the Ambassador Bridge could spill over to any of the centrally-located crossings.  Doc. 95 at 34-35.  The State Department, however, merely pointed out that in the event of a significant terrorist attack, a crossing that was not centrally-located could provide additional safeguards.  The State Department did not, as the Bridge Company suggests, say the DRIC would not provide redundancy. DRIC014766.  The State Department in fact agreed in the designation of the Preferred Alternative. DRIC116902; DRIC003818.

Overall, deference to the agency's definition of Purpose and Need is appropriate. The Court finds nothing in the Purpose and Need statement which is unreasonable.

### 3.  Procedural Arguments

The Bridge Company also attacks the DRIC study process on several procedural grounds, including that the FHWA illegally "accelerated" its environmental review, that there were incidents of "fraud," and that the AR is deficient.  None of these arguments have merit.  The FHWA fully addressed these arguments in its brief (Doc. 99 at pp. 36-

---

[12]The Bridge Company also argues that the Gateway Project will create redundancy and the agency ignored this key fact.  Doc. 95 at 36.  This is incorrect. Redundancy included both the plaza and the approach roads, not just the infrastructure of a new bridge crossing.  DRIC005909; DRIC005543.

46) the Court finds they require less attention.

First, the Bridge Company contends that the multi-year study leading up to the ROD was flawed because FHWA accelerated the NEPA process to avoid criticism from cooperating agencies.  The AR shows that the seven cooperating agencies[13] participated fully in the DRIC study process.  In May 2005, FHWA and MDOT hosted a kick-off meeting to engage United States cooperating agencies in the DRIC analysis from the outset.  DRIC047930.  The cooperating agencies participated in the scoping meeting in Detroit just three months later in August 2005.  DRIC003925.  The FHWA also entered into a streamlining agreement with each of the U.S. cooperating agencies to "anticipate and avoid surprises delays through collaboration," DRIC057011, and held 13 meetings for cooperating agencies interspersed throughout the environmental review phase to ensure their continued involvement.  The cooperating agencies were actively involved in the DRIC process, providing formal concurrence on the direction in which the Preferred Alternative was advancing, DRIC003818, reviewing and commenting on the technical reports, DRIC116521-116522; DRIC116696; DRIC116056, and providing extensive comments on drafts of the DEIS and FEIS.  DRIC056994-057002.

Second, the Bridge Company's suggestion that there was an illegal "cover up" is fatuous.  In support, the Bridge Company selectively cites out of context three quotes from documents in the AR to argue that the FHWA committed fraud and is thus not

_____

[13]The seven cooperating U.S. agencies include: (1) U.S. Environmental Protection Agency; (2) U.S. Army Corps of Engineers; (3) U.S. Coast Guard; (4) U.S. Fish & Wildlife Service; (5) U.S. General Services Administration; (6) U.S. Department of Homeland Security; and (7) U.S. State Department.

35

entitled to deference under the APA.  All of this is fully explained in the FHWA's amended reply brief (Doc. 99) at p. 37-39.  Suffice it to say that the Bridge Company's argument of manipulation does not withstand scrutiny.

Third, the Bridge Company says that the ROD should be set aside because it is disorganized and prevents a "fulsome" review of the NEPA process is not well-taken. While compilation of the AR has been challenging, the Court took an active role in ensuring the AR was complete and in a comprehendible form.  The Bride Company has not shown that the state of the AR renders the ROD arbitrary and capricious by reason of the compilation of the AR..

#### 4.  Conclusion on the Bridge Company's Arguments

While the Bridge Company believes that the FHWA got it wrong when it selected the Preferred Alternative and/or concluded there was a Purpose and Need for the DRIC, that disagreement does not render the agency's determination unreasonable under NEPA.  As set forth above, the FHWA thoroughly evaluated reasonable alternatives and reasonably established the project's Purpose and Need.  The DRIC NEPA process meets the "hard look" standard.  See Mason County, 563 F.2d at 264-65 (NEPA hard look requirement is tempered by a practical rule of reason); Nat'l Res. Def. Council, Inc. v. Tenn. Valley Auth., 502 F.2d 852, 853-54 (6th Cir. 1974).

### B.  LASED and Other Organizational Plaintiffs' Arguments[14]

#### 1.  The Right to Judicial Review

LASED argues that FHWA's selection of Delray as the host community for the

---

[14]For clarity, all of the organizational plaintiffs will be collectively referred to as "LASED."

DRIC was predetermined because it a poor and minority neighborhood.  As an initial

matter, as the FHWA points out, LASED has still not addressed Executive Order

12898's clear prohibition on judicial review.  Executive Order (E.O.) 12898 instructs

federal agencies to "identif[y] and address[ ], as appropriate, disproportionately high and

adverse human health or environmental effects . . . on minority populations and

low-income populations in the United States." E.O. No. 12,898, 59, Fed. Reg. 7,629-33

(Feb. 11, 1994).  The E.O. is clear that it "shall not be construed to create any right to

judicial review involving the compliance or noncompliance of the United States, its

agencies, its officers, or any other person with this order." 59 Fed. Reg. 7629, 7633

(1994).  LASED has not cited any controlling authority[15] which would allow them to raise

their argument, which is essentially an environmental justice (EJ) challenge.


### 2. Environmental Justice

Putting aside whether LASED has the right to mount an EJ challenge under

NEPA, the argument that the FWHA "predetermined" the location of the DRIC is not

borne out by the AR.  The AR shows an extensive process leading up to the selection of

the Delray location. See e.g., DRIC016080-016083 (ROD 1-4); DRIC002294-002296;

---

[15]LASED cites two cases from other jurisdictions in which the respective court
reviewed an environmental justice claim under NEPA, suggesting that the Court can
review FHWA's EJ analysis under the APA's arbitrary and capricious standard.
Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215 (5th Cir. 2006); Senville v.
Peters, 327 F. Supp. 2d 335 (D. Vt. 2004).  There is, however, case law to the contrary.
Sur Contra La Contaminacion v. E.P.A., 202 F.3d 443,449-50 (1st Cir. 2000) (declining
to review permit under the E.O. because it prohibited judicial review); Morongo Band of
Mission Indians v. FAA, 161 F.3d 569, 575 (9th Cir. 1998) (same).  The Sixth Circuit has
not addressed the issue.

DRIC001084-001088.  Moreover, LASED's suggestion that FHWA failed to take a "hard look" at the community impacts of locating the DRIC in Delray is wrong.  Once Delray was identified as a potential site for the DRIC, the agency engaged in an extensive EJ analysis, which incorporated an intensive community involvement effort.  Throughout the DRIC analysis, MDOT consulted with community leaders and groups on a monthly basis, held almost 100 public meetings, hearings and workshops as well as small group or one-on-one interviews in an effort to identify minority and low-income populations.  FEIS 3-31; FEIS 6-1.  Approximately 10,000 residences and businesses were sent mailings about each meeting.  FEIS ES-5.  In addition, the FHWA opened a Study Field Office at the Delray Community Center and held meetings to clarify community demographics and address community concerns.  Id.; (FEIS 3-29- 3-31).  The Court would be hard pressed to say that the FHWA failed to satisfy its EJ obligations.  This is explained more fully below.

### 3.  Procedural Completeness

LASED also argues that the decision was "pretextual" and not based on a thorough analysis.  In support. LASED cites an announcement — in advance of the official FHWA announcement — by then Michigan Governor Jennifer Granholm ("Granholm"), that the Belle Isle and Downriver alternatives were no longer under consideration.  LASED argues that Governor Granholm's premature announcement shows that the "fix was in" to select Delray as the host community for the proposed bridge.  This argument misses the mark.

LASED's suggestion that the timing of Granholm's announcement in October 2005 establishes that the Downriver and Belle Isle options were prematurely and

impermissibly eliminated from FHWA review is belied by the record. Extensive data was gathered for the area from Grosse Isle to Belle Isle from March to May 2005. DRIC005443. Between August and September, the agency, along with Canada, compared and scored the potential alternatives. Id. The Downriver and Belle Isle alternatives were not top performers as they were among those with "least potential to be implemented with minimal impacts and on a timely basis." DRIC057191; DRIC112634. Thus, the technical evaluation information showing that Belle Isle and Downriver options scored poorly and could not advance as alternatives was available before the Governor's announcement. DRIC005443; DRIC004182; DRIC016482: DRIC057200; DRIC112643.

LASED also contends that Delray was targeted because it is primarily Hispanic. The AR shows otherwise. The FHWA subjected all the alternatives, including the downriver alternatives, to the same analysis and evaluation process as Delray. DRIC057200; DRIC109000- 109005. Indeed, other areas where the agency was considering locating the DRIC, such as River Rouge and Belle Isle, have higher concentrations of low income and minority populations than Delray. DRIC127610; DRIC003364.

LASED's argument that the FHWA failed to consider community issues is also misguided. The FHWA considered community impacts as part of its Scoping process, and as part of its Illustrative Alternatives analysis. DRIC001205; DRIC127610; see supra at 10-14. Community impacts were one of the seven evaluation factors on which the agency weighed each Illustrative Alternative. DRIC112645. The FHWA produced three technical reports addressing the Illustrative Alternatives, which each respectively

39

discussed the community and EJ impacts of the Illustrative Alternatives related to plaza configuration,26 crossing location,27 technical analyses underlying the Illustrative Alternatives evaluation,28 and route technical data 29, DRIC003359, DRIC003364. The evaluation of environmental justice issues did not end at the Illustrative Alternatives phase.

Throughout the NEPA study process, the FHWA took a careful look at impacts to low income and minority communities.  To this end, in November 2007, the agency and MDOT prepared a 130- page Community Inventory Technical (CIT) Report, DRIC006838-006968, that discussed community issues and concerns, and summarized interviews with hundreds of local residents in almost two dozen groups. DRIC006847; DRIC006912-DRIC006968.  The CIT Report was designed to provide a "basic understanding of the community which will most experience the effects of a proposed crossing of the Detroit River."  DRIC006847.

In addition to the CIT report, in the FEIS, MDOT discloses that there would be disproportionately high and adverse effects on minority and low-income population groups in the study area.  Since the Illustrative Analysis phase and the DEIS, MDOT had conducted additional population studies and the field-collected data indicated that approximately 75 percent of relocation candidates are minorities, not 58 percent as the Census data had indicated.  Id.

Further, the FEIS disclosed that the Preferred Alternative would affect low income and minority population groups in the study area by relocating 257 households; potentially relocating 685 jobs; losing up to five local places of worship; eliminating two resources eligible for listing on the National Register of Historic Places; affecting Berwalt

Manor residents by building a ramp near the apartment building; eliminating the closed South Rademacher community center and playground; disrupting normal traffic patterns and rerouting two bus lines. FEIS 3-34- 3-37. The FEIS further compared the relative impacts of the No Build and Preferred Alternative on Delray. FEIS ES-28- ES-29.

Although the FEIS concluded that the project would have disproportionately high and adverse impacts on minority and low-income population groups, the FHWA developed a community and mitigation enhancement plan to avoid or minimize those effects. FEIS 3-37. The FHWA further employed an intensive community effort and performed a cumulative analysis to determine the cumulative impact of the DRIC project and other projects in the area on the community. ROD 35.

Finally, despite LASED's suggestions to the contrary, there were no "downgraded promises" as to potential mitigation measures. The proposed mitigation and community enhancement measures in the ROD include: replacement housing for displaced homes and business; avoiding the Berwalt Manor apartments; minimizing the noise impacts to Berwalt Manor residents by offering certain improvements; reducing the number of dwelling units to be displaced; replacing the pedestrian bridges over I-75 near their original locations; avoiding impacts to a center that serves low-income residents; and using air quality measures to control pollution during construction. FEIS 3-37- 3-38; FEIS, Green Sheet; ROD, Green Sheet.

There is simply no probative evidence that the agency "downgraded" the mitigation measures or that it otherwise misled the community. In fact, the Delray Community Council, Southwest Detroit Environmental Vision and People's Community Services wrote to their representative urging that the DRIC process continue as it was

41

critical to the safety and growth of the community.  DRIC130079-130082.

### 4.  Conclusion on LASED's Arguments

The is nothing in the AR establishing that the FHWA's EJ study was deficient in its approach, choice of methodology or that the proposed mitigation measures are somehow inadequate.  See Radio Ass'n, 47 F.3d at 802-03 (agency should be afforded deference in its choice of methodology).  The AR in fact shows that the FHWA was mindful of EJ issues early in the environmental review process and that the FHWA engaged the Delray neighborhood to identify and mitigate adverse impacts from the DRIC.

### C.  Amicus' Arguments

Amicus' argues that the NEPA process is flawed because the FHWA failed to seriously consider non-highway alternatives and, in particular, intermodal rail.  The AR shows otherwise.  The FHWA did consider non-highway alternatives, including the intermodal rail options, and found that they did not eliminate the need for a new international bridge.  DRIC040498; DRIC043171, DRIC043297; DRIC056975-056976; DRIC075714.  In a report on Feasible Transportation alternatives, the FHWA identified and considered several transportation planning alternatives including: (1) improvements to border processing; (2) transportation demand management; (3) new and/or improved rail alternatives including a new and/or expanded international rail crossing; (4) new and/or improved transit services; (5) new and/or improved marine services; (6) new and/or improved road alternatives with a new or expanded international road crossing; and (7) combinations of the above. DRIC040485-40489.

After analyzing each of the proposed alternatives on six metrics, the FHWA

42

concluded:

> **The assessment of transportation alternatives clearly shows that the only planning alternative that can meet the identified needs is one which includes the provision of new and/or improved roads with a new or improved crossing.  It is recognized that improved and expanded border processing capacity is an integral component of this solution**. The road improvements alternative has been identified as the most effective at addressing the transportation network requirements, border processing requirements, and provides the highest overall level of "support" to planning and tourism objectives.

DRIC040502 (emphasis in original).

The intermodal option simply did not meet the project's identified needs.  In a March 2003 memorandum from a consultant analyzing the potential diversion of truck traffic to intermodal rail and marine, the consultant found that the net impact of diversion to intermodal would be a 4.4% reduction in truck trips at the Ambassador Bridge in 2010, increasing to 8.9% in 2030.  DRIC043297.  In the travel demand forecast in 2005, the FHWA concluded that even assuming an optimistic 44% diversion of current truck traffic, the impact would be to postpone capacity shortfalls by only two years. DRIC015196.  Although the FHWA found that "improvements to rail services are recommended as part of a long-term border strategy," it concluded that intermodal did not satisfy the purpose and need of the project given that "**diversion of truck and passenger car traffic to rail will not in itself address the identified problems or meet the long term transportation requirements.**" DRIC040498 (emphasis in original).

The FHWA also concluded that the intermodal was not a feasible global alternative, noting that "the auto industry use of intermodal rail is relatively mature and the significant proportion of the machinery and electronics goods that are transported at

43

the border crossing, which are not conducive to intermodal rail." Id; see also

DRIC015145.

In short, the FHWA reasonably concluded that although non-highway alternatives

such as intermodal rail were a component of the long-term border congestion strategy,

a new international bridge was necessary to fulfill the Purpose and Need of the project.

Amicus also contends that the NEPA process was flawed because MDOT's

contract with the project consultant violated NEPA and the agency failed to consult with

all necessary agencies. These arguments fail. First, Amicus' argument that MDOT's

contract with the project consultant, the Corradino Group, violates NEPA because it

limited the work to highway alternatives is contrary to the AR. The Scope of the Work

for he contract was clear that Corradino's analysis could include non-highway

alternatives. See Doc 83, Ex. E at 173-74. There was no predetermined conclusion

that only highway alternatives would be analyzed as part of the DRIC process. Second,

as explained above, the FHWA meaningfully included all necessary agencies in the

NEPA study process. Even if the Federal Railroad Administration (FRA) and Federal

Transit Administration (FTA) were not among the cooperating agencies, as Amicus

appears to suggest they should have been, they did have an opportunity for meaningful

participation; both were provided a draft of the DEIS and FEIS for comment. FEIS 8-1;

DEIS 8-1. Neither agency chose to comment.

### VIII. Conclusion

An agency's decision must be upheld unless it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review

under the arbitrary and capricious standard is narrow, and we do not substitute our

judgment for that of the agency." <u>Lands Council v. McNair</u>, 537 F.3d 981, 987 (9th Cir.

2008), overruled in part on other grounds by <u>Winter v. Natural Res. Def. Council, Inc.</u>,

555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

The DRIC planning process began in 2001 and took almost eight years before

the ROD was issued in January 2009.  It included the issuance of a DEIS in February

2008 and a FEIS in November 2008 which formed the basis for the ROD.  The AR

consists of over 130,000 pages of documents evidencing environmental review,

consideration of alternatives, public comments, various studies, detailed analyses and

discussion.  The FHWA considered all relevant environmental impacts that the selection

of the Preferred Alternative would have on Delray.

On the record before it, the Court concludes that the FHWA acted in an reasoned

and deliberative fashion when it approved the proposed new international bridge

crossing in the Delray neighborhood.  The assertion of plaintiffs that the FHWA acted

arbitrarily and capriciously has no merit.  The FHWA's motion to affirm is GRANTED.

The ROD is AFFIRMED.

SO ORDERED.


Dated:  April 5, 2012                      _S/Avern Cohn_____
                                            AVERN COHN
                                            UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, April 5, 2012, by electronic and/or ordinary mail.

                                            _S/Julie Owens_____
                                            Case Manager, (313) 234-5160

45

**10-10082 LASED v. FHWA, et al**
**Decision and Order Granting Defendants' Motion to Affirm**

## APPENDIX

## LIST OF ACRONYMS

APA          Administrative Procedure Act

AR           Administrative Record

CEQ          Council on Environmental Quality

CIT          Community Inventory Technical Report

DEIS         Draft Environmental Impact Statement

DRIC         Detroit River International Crossing

EIS          Environmental Impact Statement

EJ           Environmental Justice

EO           Executive Order

FEIS         Final Environmental Impact Statement

FHWA         Federal Highway Administration

GSA          General Services Administration

LASED        Latin Americas for Social and Economic Development

MDOT         Michigan Department of Transportation

NEPA National Environmental Protection Act

NHPA         National Historic Preservation Act

ROD          Record of Decision